INTERNATIONAL CHEMICAL WORK-
ERS UNION LOCAL 483, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Cabot Corporation, Intervenor.

No. 76–1491.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 27, 1977.

Decided May 10, 1977.

Rehearing Denied June 19, 1977.

C. Paul Barker, New Orleans, La., for petitioner.

Jerry L. Gardner, Jr., New Orleans, La., was on the brief for petitioner.

David A. Fleischer, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Aileen A. Armstrong,

Atty., N. L. R. B., Washington, D. C., were on the brief for respondent.

Andrew C. Partee, Jr., New Orleans, La., entered an appearance for intervenor.

Before MacKINNON, ROBB and WIL-KEY, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

The unfair labor practice charges on complaint of the union arose out of a strike situation. We affirm the two-to-one decision of the Board which held that the company did not violate the Act.

I

During a strike of Local 483 of the Chemical Workers at the carbon black plant of Cabot Corporation at Franklin, Louisiana, which began on July 1, 1974, the corporation hired Payne and Keller of Louisiana Inc. (P & K), to erect a security fence and to do "turn-around maintenance work" for which it customarily subcontracted. The existing contract between Cabot and Local 483 only ran until July 1, 1974. At that time the parties had been bargaining since May 30, 1974, and since the union members went on strike on July 1, 1974, it was self-evident that an impasse had been reached in the bargaining between the parties. Since the relations were at an impasse there was no obligation on July 22 and 24 for Cabot to bargain with Local 483 over the wages to be paid to "strike replacements." *Leveld Wholesale, Inc.,* 218 NLRB 1344 (1975); *Imperial Outdoor Advertising,* 192 NLRB 1248 (1971). Cabot never did contract for any employees of P & K, directly or indirectly, to engage in any production work at the plant.

P & K were generally engaged in building, construction and plant maintenance, having 12 other maintenance contracts, all of which were substantially the same as the contract it entered into with Cabot. Cabot and P & K had no business relations prior to the strike. However, when the strike occurred Cabot sought to protect its plant and to that end executed two contracts with P & K on July 22 and 24, 1974. One contract was for the construction of a security fence and one was for the maintenance work. Each contract provided that P & K would function as an independent contractor on a cost-plus basis.

On July 25, 1974, Local 102 of the American Federation of Unions obtained signed authorization cards from a majority of the P & K employees working at the Cabot plant. P & K checked the authorization cards and the next day, July 26, 1974, on the basis of that check, recognized Local 102 as the bargaining representative for its employees at the Cabot plant. It is significant that P & K had collective bargaining contracts with Local 102 at 10 of the other 12 plants where it had employees and that the terms of P & K's contract with Cabot coincided generally with the terms of the contracts P & K had with companies at the other plants where Local 102 represented its employees.

In addition to its contract with P & K, Cabot also on June 28, 1974, had contracted with Southwest Security Service (hereinafter "Security") for guard service during the strike. These services also included supplying vehicles and equipment and furnishing guard service at the plant, on buses transporting P & K personnel to and from the plant, and at a motel where P & K employees were staying and where P & K had an office.

Local 483 filed unfair labor charges against P & K and Cabot claiming that they were responsible for the following acts of the security guards: (1) One Aucoin on July 12th, while drunk, fired a pistol at a truck owned by a striking Cabot employee which was parked in front of the employee's house. The truck was struck by three bullets. Aucoin then went to the Cabot plant where the brother of the president of Security asked him to leave the premises because he was drunk. Before he left, Aucoin pistol-whipped a striking employee and pointed the pistol at another striker. Aucoin was arrested and convicted of damag-

ing the truck and of the pistol whipping. Security later reinstated him but Cabot directed that he be removed from the property. (2) On July 13th a guard named Hunter accidentally discharged the shotgun he was loading by closing the breech too quickly. Hunter was fired two days later. (3) In mid-August, a guard named Harding, while driving his car through the picket line at the Cabot plant was told by a striking employee that he would be "in big trouble" if he hit any pickets. Harding said he was coming through and anyone obstructing the way would be hit. He got out of his car holding a pistol pointed at the ground, picked up some tacks on the road in front of the car and threw them in front of a striker's car. Later when he exited the plant Hunter got out and picked up some more tacks from the road and threw them in front of the cars of striking employees. One of the Security guards then told Harding to leave. (4) Also, when Theriot, the president of Security, was driving a bus or truck into the plant he almost struck pickets at the entrance. The pickets had moved across the road at the entrance when they saw Theriot approaching. One of the pickets was arrested for obstructing traffic.

Out of the foregoing factual situation Local 483, *inter alia,* charged Cabot and P & K with violating section 8(a)(2) and (5)[1] of the National Labor Relations Act. This portion of the union's complaint alleged that the employees at the Cabot plant on July 25th were not just employees of P & K but were *joint employees* of Cabot Corporation and hence were covered by Cabot's contract with Local 483, and the recognition by P & K of Local 102 as the collective bargaining representative for the maintenance employees amounted to a refusal to bargain collectively with Local 483. The proper outcome of this dispute depends, as the brief of Local 483 postulates the issue: "Whether Cabot Corporation and Payne

and Keller of Louisiana, Inc., constitute a joint employer of employees at the Cabot plant." Petitioner's Brief, p. 1.

In a two-to-one decision the National Labor Relations Board held that the replacement maintenance workers were employees solely of P & K, *i. e.,* that a joint employer situation did not exist between Cabot Corporation and P & K. This conclusion must be affirmed if supported by substantial evidence in the record as a whole.

The operative facts upon which the ultimate decision depends are in many instances capable of two interpretations, but both the Administrative Law Judge and a majority of the Board delegated to decide the case interpreted the facts to support the conclusion that the workers were employed solely by P & K corporation.

The facts must be examined closely. Probably the four most influential circumstances are: First, P & K was regularly engaged in a substantial independent business in which it had contracts, similar to its Cabot contract, with 12 other companies in other localities. Second, P & K had collective bargaining contracts with Local 102 covering its employees at 10 of the 12 other operations. Third, the contract between Cabot and P & K when it was entered into was intended as a temporary contract to extend only for the duration of the strike. Fourth, the services being contracted for involved maintenance work, originally just turn-around maintenance.

Whether Cabot and P & K were joint employers depends upon the amount of actual and potential control that Cabot had over the replacement employees. This in turn, to a certain extent, is dependent upon the amount and nature of control that Cabot exercised and was authorized to exercise under the contract. The issue is essentially factual. *Boire v. Greyhound Corp.,* 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

---

1. Section 8(a)(2) provides:

    It shall be an unfair labor practice for an employer—

    \*   \*   \*   \*   \*   \*

    (2) to dominate or interfere with the formation or administration of any labor organization . . . .

    \*   \*   \*   \*   \*   \*

    (5) to refuse to bargain collectively with the representatives of his employees . . . .

We look to the terms of the contract and to the actual operations. We do not discuss the operations under the contract to construct the fence because that was not seriously attacked.

Under the contract for the maintenance work P & K is designated as an independent contractor. While this is not determinative of Cabot's control over P & K's employees, it does bespeak an intent by Cabot to look primarily to results and to vest in P & K an independence in the control of its employees that is at least facially inconsistent with Cabot exercising any substantial degree of control over the *manner and means* that P & K's employees were to perform their services. The agreement is a cost-plus contract with all the cost items being set forth in great detail. These costs originated with P & K and were the same as P & K was paying to its employees under union contracts elsewhere with Local 102 but higher than had been paid by Cabot to its employees who performed similar duties. The fact that the wage scale was set by P & K is some indication of control by P & K rather than by Cabot.

The contract also gave Cabot the right to have P & K remove an employee from the Cabot job—but not from the employment of P & K. Such provision was understandable in view of the emergency aspects of the employment and the emotional considerations that individual employees might engender in the strike situation. But Cabot had no control over the hiring of P & K employees, and it had no right to compel P & K to remove all employees. If a dispute arose over this provision it would most likely be interpreted as requiring just cause before Cabot could compel P & K to remove an employee over P & K's insistence on retaining him.

Either party could terminate the contract on 30 days' notice and Cabot could terminate it at any time. This was consistent with the temporary character of the contract. Such power might have been misused to acquire greater control than was explicitly given by the contract, but there is no showing that such was done and there are no facts here which would permit us to presume that it had that ulterior purpose.

The contract also required P & K to perform certain work according to Cabot's drawings and specifications and subject to Cabot's approval. This is consistent with the usual requirement of independent contracts that the result of a designated job be subject to final approval by the contracting party. Such right does not necessarily involve the contracting party in any control of the employees in the details of their work and, since there is no finding here that Cabot actually did control the employees of P & K to that extent, we cannot reach that conclusion on our own.

As for the provision that P & K would not assign the contract, that restriction does not in any way indicate that Cabot controlled the employees in the performance of the work that was charged to them. Such provision is merely designed to guarantee that the responsibility Cabot imposed on P & K will actually be exercised by P & K and not by some company that Cabot might consider to be less reliable. The tasks that Cabot selected P & K to perform had certain aspects that were very delicate and in less reliable hands might lead to substantial monetary damages. It was thus not out of keeping with the independent nature of P & K's status under the contract for Cabot to insist in the agreement on a provision that assured it could hold P & K, with its established reliability and competency in this field, accountable for all the tasks assigned to it under the contract.

To supervise the performance of the contract, P & K maintained its own office at the plant. The employees who performed the work were also on its own payroll. P & K paid their Social Security and other taxes and had its own time keeper. Also, for the first two months the supervisors of P & K supervised the turn-around maintenance work. It was during this period of time that Local 483 alleges the parties committed the violations of section 8(a)(2) and (5) but during this period it is clear that a joint employer relationship did not exist. Cabot's supervisors also made a daily head

count of P & K employees on the job and monitored the results of the work but the daily check of employees did not involve Cabot in supervising the actual work and neither did monitoring the results. The monitoring merely aimed at a satisfactory work product and did not involve Cabot in the details of the work sufficient to turn it into a joint employer. We thus agree with the Board's conclusion that:

the cost-plus contracts merely insured that Cabot obtain a satisfactory work product at cost and protected it against unnecessary charges being incurred, while giving P & K a profit, but . . . Cabot did not exercise the type of control which would establish a joint employer relationship. Cabot's policing of the contracts only assured it that P & K was actually incurring the expenses for which it claimed reimbursement and that the final product was satisfactory.

(App. 6, footnotes omitted).

## II

A further development occurred on September 23, 1974. By that date all the necessary "turn-around maintenance" at the plant had been completed; P & K then switched its employees to doing general maintenance work. At that time, two months after P & K first undertook to perform its contractual obligations, supervisors employed by *Cabot* began to supervise the general maintenance work that P & K employees now undertook for the first time. This change in supervision was considered necessary because the applicable safety requirements were complex and required a great deal of expertise to apply them correctly. P & K supervisors were not competent to perform this function and they would have required considerable training to acquire such proficiency. Because of the temporary nature of the P & K contract, for the life of the strike, it was not considered desirable to train P & K supervisors. The Board majority found that this

single change in the operations, *long after the recognition and bargaining with Local 102 had taken place,* is not sufficient to warrant a finding that P & K

and Cabot were or became a joint employer. . . . [A]nd since no other basis is suggested by the General Counsel for finding a violation by either, we conclude that Cabot has not violated either Section 8(a)(2) or Section 8(a)(5) of the Act in connection with P & K's relationship with Local 102.

App. 7–8 (footnotes omitted, emphasis added).

In reaching this conclusion the Board also noted that when P & K recognized Local 102 there was no certainty that its employees would ever perform any of the general maintenance work (App. 7).

■ We find no reason to dispute the Board's conclusion. Of course the conclusion *is* a close one but on balance we are impressed with the Board's reasoning that factors which take this situation out of the stereotype of these cases are sufficient to arrive at a conclusion that a joint employer status was not created here. These factors include: (1) the temporary (short) nature of the contract; (2) the definite status of P & K as a separate independently operating company that regularly performed similar tasks under contracts to other companies; (3) that Cabot had customarily contracted out its "turn-around maintenance" work; (4) that P & K was hired to perform a specific task and was permitted to determine how that task was to be performed; (5) the wage rates were set by P & K in accordance with those in its other collective bargaining contracts with the same union; (6) P & K had general control over the hiring, firing, assignment and disciplining of its employees; (7) the financial affairs of the two companies were not merged, and of course finally, (8) Cabot did not have authority to, and did not actually, direct the P & K employees in the details of their work. This is not to say that a different result might not have been reached for the period after September 23, 1974, if the changed supervision after that date had amounted to anything more than a temporary expedient under a temporary contract.

### III

In reaching the above conclusion we have thoroughly considered the Board Member's dissent which deals extensively with the facts and the law. In general it comes to almost diametrically opposed conclusions on all the principal features of the case, but such result is based primarily on different interpretations of facts which are capable of two different conclusions. In several instances the dissent also assumed, and conclusorily stated, what remained to be proved. Example: "The maintenance contract between the parties *established* that Cabot retained the right to control P & K employees, thereby establishing a joint employer relationship." App. 13. The dissent then listed most of the factors we have discussed above. But, the difficulty with such list is that those factors do *not* establish that Cabot had the right to control the employees of P & K in detail as to the manner and means by which they performed their work under the contract and Cabot did not actually exercise such control. The Administrative Law Judge, who acted as the factfinder in this case, found that these factors did not add up to sufficient control to constitute Cabot a joint employer. That finding, now supported by the majority decision of the Board, is to be sustained unless it is not supported by substantial evidence. In reaching our decision we do not consider it appropriate to speculate that Cabot might have exercised control in a direct or indirect manner by means that are in reality outside the contemplation of the contract and which were never in fact exercised by Cabot. Any contract is capable of subversion. Its provisions might be altered, ignored or the economic force of the party to the contract that is purchasing services might be perverted to compel the other party actually to operate in a manner contrary to the provisions of the written agreement; but until there is some proof that such happened, the terms of the contract should not be treated as though they were a sham.

Another difficulty we have in reaching a contrary conclusion is that the record before us does not sufficiently spell out the exact type of "maintenance" work that was performed by the employees so as to enable us to reach any conclusion except that Cabot did *not* exercise control over the details of the work.

### IV

A second allegation charges that Security, as the agent of Cabot and P & K, engaged in misconduct against striking employees in violation of section 8(a)(1)[2] of the Act. The acts in question are detailed above. The Administrative Law Judge decided that the statute was not violated and the Board reached a similar decision, again with one member dissenting.

In reaching these decisions the Board majority followed the finding and reasoning of the Administrative Law Judge. As to Aucoin it was pointed out that his misconduct was unauthorized, did not occur while he was on duty and that Security was not responsible therefor. Also, he was fired immediately. The fact that he was subsequently given a second chance to return to work, only to be fired at the direction of Cabot, did not operate to make Security responsible for his prior misconduct. The dissent in discussing this incident does not refer to the fact that Aucoin was drunk when he misconducted himself. This is an important element which should not be ignored when one considers the liability of an employer for unauthorized acts committed by an employee particularly when the employee was off duty.

As for Hunter there is no evidence that the discharge of the gun was other than accidental. In Harding's case his conduct was a normal reaction to the illegal acts of the pickets in placing tacks in the roadway in front of his car, and his subsequent acts were in self-defense to guard his

---

**2.** Section 8(a)(1) provides:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . .

own person and not to interfere with any lawful picketing. Placing tacks on roadways by strikers in an effort to disable cars of company employees going to work is not within the range of legal or peaceful picketing. When pickets engage in such tactics they must expect that those who have a right to use the roadway, and desire to do so, might attempt to enforce their right. The resulting confrontation, with its threats and counterthreats, is not improper conduct that in this instance is properly chargeable to Security. As for the incident involving Theriot (Security's president), that was provoked by the pickets when they unlawfully obstructed the roadway. The Board was unable to find that Theriot's conduct in such circumstances amounted to a violation of section 8(a)(1). Neither can we.

Thus, it does not appear that Security directed, authorized, ratified or condoned any act in violation of section 8(a)(1) by its employees and hence is not to be held responsible therefor.

For the reasons set forth above we affirm the decision of the Board dismissing the complaint in this case.

*Judgment accordingly.*