590 F.2d 688
 100 L.R.R.M. (BNA) 2356, 85 Lab.Cas. P 11,003
 PACKING HOUSE AND INDUSTRIAL SERVICES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local P-38, Amalgamated Meat Cutters and Butcher Workmen of
North America,AFL-CIO, Intervenor-Respondent.
MASON CITY DRESSED BEEF, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local P-38, Amalgamated Meat Cutters and Butcher Workmen of
North America,AFL-CIO, Intervenor-Respondent.
 Nos. 77-1691, 77-1726.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 18, 1978.
Decided Dec. 21, 1978.
 
 William H. Bruckner, Tate, Bruckner & Sykes, Houston, Tex., and Kenneth R. Carr, Grambling, Mounce, Sims, Galatzan & Harris, El Paso, Tex., for petitioner.
 David F. Zorensky, Atty., N. L. R. B., Washington, D. C., for respondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., on the brief.
 Peggy A. Hillman, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for intervenor-respondent, Local P-38, etc.
 Before GIBSON, Chief Judge, and LAY, HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Mason City Dressed Beef, Inc. (MCDB) and Packing House and Industrial Services, Inc. (PHIS) seek to review and set aside an order of the National Labor Relations Board (the Board). The Board has cross-petitioned for enforcement.[1]
 
 
 2
 The controversy concerns alleged efforts by petitioners, immediately following their takeover of the ownership and management of a Mason City, Iowa, beef slaughtering plant, to employ a new labor force and thereby supplant Local P-38 as the bargaining representative of a unit of approximately eighty-three production and maintenance employees. MCDB, by purchase contract dated January 31, 1976, acquired the plant's assets from Iowa Beef Processors, Inc. (IBP). PHIS, by contract dated February 5, 1976, agreed to operate the plant for MCDB and in connection therewith to hire most of the plant's labor force.
 
 
 3
 IBP, a large meat packing operation with headquarters in Dakota City, Nebraska, had owned and operated the Mason City plant from 1969 until the time of the sale to MCDB. Labor relations at the plant were governed by successive collective bargaining agreements with Local P-38, the last of which had been executed in August 1974 and was due to expire in January 1977. The impetus for the sale was a civil antitrust consent decree approved by the United States District Court for the Northern District of Iowa on March 23, 1970, under which IBP had undertaken to divest itself of ownership and control of the plant.
 
 
 4
 Petitioners' efforts to hire a new labor force at the plant were the subject of an unfair labor practices hearing conducted before an administrative law judge. The ALJ concluded that petitioners had committed unfair labor practices in violation of Sections 8(a)(1), (2), (3) and (5) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 158(a)(1), (2), (3) and (5). Specifically, petitioners were found to have: (1) told certain former IBP employees that they would not be rehired because of their union membership and activities, in violation of Section 8(a)(1); (2) assisted the National Industrial Workers Union (NIWU) in obtaining union membership cards and recognized and executed a collective bargaining agreement with NIWU, in violation of Sections 8(a)(2) and (1); (3) refused to rehire the eighty-three former IBP employees in order to discourage their membership in and support for Local P-38, in violation of Sections 8(a)(3) and (1); and (4) refused to recognize and bargain with Local P-38 as the duly designated bargaining representative of the plant's production and maintenance employees, in violation of Sections 8(a)(5) and (1). The ALJ recommended entry of an order requiring petitioners to cease and desist from the practices found to constitute unfair labor practices, to withdraw recognition from NIWU, to offer reinstatement with seniority and backpay to the eighty-three former IBP employees, to recognize and bargain with Local P-38, and to post a specified notice.
 
 
 5
 The Board modified and disavowed certain of the ALJ's subsidiary findings but agreed that petitioners had committed each of the unfair labor practices listed above. After modifying the contents of the notice required to be posted, the Board adopted the ALJ's recommended remedial order. Mason City Dressed Beef, Inc., 231 NLRB No. 102, 97 LRRM 1215 (1977).
 
 
 6
 Petitioners challenge each of the Board's unfair labor practice findings as not supported by substantial evidence and not consonant with law. At the center of the challenge is the Section 8(a)(3) finding that petitioners discriminatorily refused to rehire the eighty-three former IBP employees.
 
 
 7
 A number of additional contentions are also raised. MCDB argues that any unfair labor practices which may have been committed are the sole responsibility of PHIS, and more particularly, that the Board incorrectly held PHIS to be an agent of MCDB. MCDB also challenges the impartiality of the ALJ. PHIS objects to certain evidentiary rulings made by the ALJ.
 
 
 8
 For the reasons stated herein, we grant enforcement of the Board's order against MCDB and PHIS regarding all but two of the charges. By an evenly divided (4-4) vote this court denies enforcement of the Board's order against MCDB and PHIS regarding the alleged independent violations of Sections 8(a)(1) and 8(a)(5).[2]
 
 I.
 
 9
 As the Supreme Court has recognized, resolution of a "successor" employer's labor law obligations to the employees of its predecessor turns to a great extent on the precise facts involved. Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 256, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); NLRB v. Burns International Security Serv., Inc., 406 U.S. 272, 274, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). We begin, then, with a summary of the facts as found by the Board.
 
 
 10
 The story begins in the context of IBP's previously unsuccessful efforts to dispose of the Mason City plant in accordance with the 1970 antitrust decree. Late in 1975, while IBP continued to operate the plant, one Sam W. Davis expressed an interest in acquiring it. Davis organized MCDB, and extensive negotiations resulted in the execution of two contracts between IBP and MCDB on January 31, 1976.
 
 
 11
 The first contract (the purchase agreement) transferred from IBP to MCDB, effective on closing, the possession of and right to use all of the plant's operating assets and reserved for IBP the legal title to such assets as security for ultimate payment of the $1,750,000 purchase price. No down payment was required, and payment was to be made in monthly installments over a ten-year period.
 
 
 12
 The second contract (the slaughter agreement) required MCDB to sell and IBP to buy the plant's entire output. Production was limited to cows and fat cattle, and MCDB agreed to use its best efforts to provide IBP with 2,200 to 4,000 carcasses per week. IBP agreed to reimburse MCDB for its costs (defined by the contract) plus $1.50 per head.
 
 
 13
 At the same time Davis was negotiating the details of the contracts with IBP, he came into contact with Charles Sykes, a labor lawyer who at times had represented IBP and who then represented PHIS.[3] Beginning sometime in January, Davis and Sykes negotiated the terms of a contract whereby PHIS would manage the Mason City plant for MCDB. The contract was executed on February 5.
 
 
 14
 The MCDB-PHIS contract required PHIS to staff and operate the plant as a beef slaughtering facility. Either party could terminate the agreement on ten days' written notice. MCDB paid PHIS an initial service fee of $25,000 and agreed to compensate PHIS on a weekly basis in an amount equal to PHIS' costs of operation plus $800. "Costs" were defined to include wages and other employee benefits. All employees were to be employed and controlled exclusively by PHIS, with the exception of a few individuals whom MCDB and IBP wished to station on the premises. MCDB retained the responsibility for securing the cattle to be slaughtered.
 
 
 15
 During January and February both Davis and Sykes discussed labor relations at the plant with Arden Walker, IBP's vice president for industrial relations and its principal spokesman on labor matters. Walker told Sykes that the supervisory staff at the plant was reliable and that some of the production and maintenance employees were valuable while others were not.[4] He noted that the plant had experienced problems with labor relations and absenteeism and that these problems had contributed in part to the unprofitability of the operation under IBP management.
 
 
 16
 Nothing definite about the sale was communicated to the plant's employees or to Local P-38 until late in January. On or about January 27, Local P-38 obtained information leading it to believe that a transfer of the plant to MCDB was imminent. Various attempts by union officials to discuss the effects of the change in ownership with Davis were unsuccessful. Plant manager Trupe[5] notified all supervisory and clerical employees to report to work as usual on Monday, February 2, and they did so. Early in the week engineers employed by MCDB inspected the plant and reported to Davis that the plant could be remodeled with expenditures of perhaps $500,000. Davis told Sykes that such expenditures were out of the question, and the two of them agreed that the plant should be reopened as soon as possible. Also early in the week Ray Long, a union representative, and other local union officials went to the plant to speak with Trupe. In response to their inquiries, Trupe said he did not owe the former IBP employees anything, ordered those present to leave the premises, told them not to come back and instructed them to keep union members away.
 
 
 17
 Sykes and Trupe commenced efforts to hire a new labor force during the week of February 2. Sykes told Trupe not to recall any of the displaced IBP employees. Trupe and others in management invited several individuals who had local applications in IBP's personnel files to report to work on Saturday morning, February 7. Sykes paid two individuals a total of $4,500 to recruit about thirty workers from the Omaha, Nebraska area, some 265 miles from Mason City. These recruits were promised $500 plus expenses for working the first week and $5 an hour without expenses thereafter. They arrived in Mason City on February 5 and 6 in vans rented by Sykes or persons acting in his behalf and registered at a motel some twenty miles away. Sykes personally arranged for these motel accommodations and picked up the tab.
 
 
 18
 All applicants reported to the plant locker room early Saturday morning, February 7. Job application forms and W-4 forms were passed out, signed and returned. At or about the same time, and before any work began, two unidentified men appeared in the locker room, asked the applicants if they wished to join a union, assured them that they were under no compulsion to do so, and passed out union designation cards on behalf of NIWU. The applicants signed the cards and returned them immediately. These cards authorized NIWU to act as the employees' bargaining agent. On February 9 PHIS and NIWU executed a collective bargaining agreement, with Sykes signing on behalf of PHIS. The agreement provided for a basic wage rate of five dollars an hour and in substantial part incorporated the provisions of an agreement used by IBP in Amarillo, Texas. Early in March, after charges had been filed with the Board, PHIS withdrew recognition from NIWU because of the controversy surrounding its status as bargaining agent. During its brief incumbency, NIWU did not appoint stewards, process grievances or collect dues.
 
 
 19
 The plant commenced operations under PHIS during the morning hours of Saturday, February 7. By all accounts the morning's production was a mild disaster. Beef was destroyed or damaged, hides were scored and production proceeded at an exceedingly slow pace.[6] Trupe attributed the difficulties to the employees' lack of experience.
 
 
 20
 By Monday morning, February 9, Local P-38 had learned of the resumption of operations the previous Saturday. A large crowd of former IBP employees gathered at the plant entrance, where they continued to gather each workday for the next three weeks. While no formal picketing occurred, they did distribute a leaflet attempting to elicit community support and occasionally shouted and engaged in cat-calling at persons reporting for work. Many of the new employees, fearing reprisals by displaced IBP workers, did not report to work. No beef production took place on February 9 or 10. Most of the Omaha recruits returns to Omaha on February 9. Within two or three weeks, only two or three of those hired on February 7 remained on the job.
 
 
 21
 On February 9 two union officials sent the following telegram to both MCDB and PHIS:
 
 
 22
 We understand that you have resumed operations at the Mason City plant previously operated by Iowa Beef Processors Incorporated. You have not offered employment to any former employees. This will confirm that all production and maintenance employees who were employed at this plant by Iowa Beef Processors are available for continued employment by you and we hereby make application to you on their behalf for employment at this plant.
 
 
 23
 Persons on both sides of the dispute stated their respective positions in interviews aired on local television on February 9 and 11.
 
 
 24
 The union expressed its belief that the successor clause contained in the collective bargaining agreement with IBP bound the new employer. The union's main objective, however, was to get its members back to work and to open negotiations concerning terms and conditions of employment.[7] Sykes stated that the blanket application contained in the February 9 telegram was insufficient and that PHIS was hiring solely on the basis of individual applications.
 
 
 25
 A number of other incidents and conversations occurred at various times in February. On February 3 foreman Edward M. Millard gave three former IBP employees letters of recommendation which they had requested. He later told one of them that he had "caught hell" from Trupe because such recommendations were against company policy. On February 7 chief steward Larry Bucci phoned Richard Mammen, his long-time friend and the assistant foreman of the kill floor, to inquire about the accuracy of reports that production had taken place that morning. Mammen met with Bucci and others that evening, told them about the morning's operations, and stated that he thought some fifteen or twenty former IBP employees would be rehired at some point in the distant future but that no past or present union officers would ever be rehired. On or about February 24 foreman Bill LeDuc similarly told Bucci that fifteen or twenty former IBP employees, but no union officers, would be rehired in the distant future. Earlier in the month LeDuc had told a new employee that the company was hiring new employees because it didn't want the union back in the plant. On or about February 14 LeDuc told a former IBP employee he knew the company was trying to break the union. On one occasion LeDuc sought permission to rehire a former IBP employee but was told by Trupe that he could not do so for perhaps two or three months.
 
 
 26
 On March 12 Local P-38 sought leave to intervene in the antitrust case in order to request a court order directing that the documents relating to the sale of the plant from IBP to MCDB include an assignment of the existing collective bargaining agreement between IBP and Local P-38. In its order of March 19, which gave final approval to the sale, the court denied leave to intervene on several grounds.
 
 
 27
 Although the gathering at the plant stopped after three weeks, PHIS continued to experience difficulties in maintaining a stable work force. Over a three-month period nearly two hundred persons were hired for a unit normally comprised of just over eighty. Most persons newly hired quit voluntarily.[8] On or about March 24, Local P-38 held a meeting and discussed whether former IBP employees should accede to PHIS' requirement of making individual applications for reemployment or whether they should hold fast to the position that the February 9 telegram to MCDB and PHIS constituted a sufficient application. By the first of May various employees, with union assent, began to file individual applications with PHIS. Between May 1 and September 11 at least twenty-three former IBP employees filed such applications,[9] twelve were rehired and two others were offered employment but declined. No union officers were rehired, although at least one filed an application.
 
 
 28
 We of course review the Board's factfindings under the familiar standard of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that they must be supported by substantial evidence on the record as a whole.
 
 II.
 
 29
 Section 8(a)(2) prohibits company domination or interference with the formation or administration of any labor organization as well as contribution of financial or other support to any labor organization. The Board concluded that petitioners violated Section 8(a)(2) by assisting NIWU in obtaining union membership cards and by recognizing and executing a collective bargaining agreement with NIWU.
 
 
 30
 Substantial evidence on the record as a whole clearly supports the Board's finding that two unidentified men passed out NIWU union designation cards in the plant locker room on the morning of February 7 at or about the time that job applications and W-4 forms were passed out. The Board found that a collective bargaining agreement was executed between PHIS and NIWU only two days later and that the basic wage rate specified in that agreement (which was sixty-three cents per hour lower than the basic wage rate previously paid by IBP) equaled the basic wage rate which PHIS had offered to its hastily recruited new employees.
 
 
 31
 When viewing the above facts in the context of all the events which transpired in late January and early February, we think the Board's conclusion that the union cards were obtained by or with the assistance of PHIS' supervisors is not only permissible but virtually inescapable. Indeed, this case is considerably stronger than NLRB v. Vernitron Electrical Components, Inc., 548 F.2d 24, 26 (1st Cir. 1977), in which the First Circuit granted enforcement to a Board order based on similar facts. The Board's Section 8(a)(2) finding is affirmed and the corresponding provisions of the Board's order are enforced.
 
 III.
 
 32
 Section 8(a)(3) prohibits discrimination in regard to hire, tenure or any term or condition of employment to encourage or discourage membership in any labor organization. The Board concluded that petitioners had discriminatorily refused to hire the eighty-three former IBP employees in violation of this section. We confine our immediate attention to PHIS.
 
 
 33
 It is clear in the first instance that PHIS was under no legal obligation to hire all, or even any, of the former IBP employees. Howard Johnson Co. v. Detroit Local Joint Exec. Bd., supra, 417 U.S. at 261-62, 94 S.Ct. 2236; NLRB v. Burns International Security Serv., Inc., supra, 406 U.S. at 280 n.5, 92 S.Ct. 1571; Tri State Maintenance Corp. v. NLRB,132 U.S.App.D.C. 368, 370, 408 F.2d 171, 173 (1968). The Board neither found nor contends that either MCDB or PHIS is the alter ego of IBP and as such subject to the legal and contractual obligations of IBP. See Howard Johnson Co. v. Detroit Local Joint Exec. Bd., supra, 417 U.S. at 259 n.5, 94 S.Ct. 2236, 2242 n.5. In any event, the sale from IBP to MCDB, under mandate of the antitrust decree, was in no sense a "paper transaction without meaningful impact on the ownership or operation of the enterprise." Id.
 
 
 34
 It is equally clear, however, that PHIS could not refuse to hire the former IBP employees because they were union members or to avoid having to recognize the union. Howard Johnson Co. v. Detroit Local Joint Exec. Bd., supra, 417 U.S. at 262 n.8, 94 S.Ct. 2236; NLRB v. Burns International Security Serv., Inc., supra, 406 U.S. at 280-81 n.5, 92 S.Ct. 1571; NLRB v. Bausch & Lomb, Inc., 526 F.2d 817, 821 (2d Cir. 1975); Tri State Maintenance Corp. v. NLRB, supra, 132 U.S.App.D.C. at 371, 408 F.2d at 174; K. B. & J. Young's Super Mkts., Inc. v. NLRB, 377 F.2d 463, 465-66 (9th Cir.), Cert. denied, 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967); NLRB v. New England Tank Industries, Inc., 302 F.2d 273, 275 (1st Cir.), Cert. denied, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962); Piasecki Aircraft Corp. v. NLRB, 280 F.2d 575, 585 (3d Cir. 1960), Cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961).
 
 
 35
 The Board's critical finding that PHIS "determined not to hire any former IBP employees until a different complement of employees had been established in the plant" is supported by substantial evidence on the record as a whole. The finding is based primarily upon the following subsidiary findings, all of which have a substantial evidentiary basis in the record: (1) Sykes specifically instructed Trupe in early February not to hire any of the former IBP employees,[10] and none were in fact hired until May; (2) considerable money and effort were expended in obtaining less experienced workers from a distant city without any corresponding attempts to contact former IBP employees; (3) when union officials came to the plant to discuss the situation with Trupe, they were ordered to leave the premises and instructed to keep union members away; (4) a foreman who sought permission to hire a former employee was told he would have to wait perhaps two or three months; (5) another foreman was reprimanded for giving recommendations to several former employees; (6) two foremen expressed the view that PHIS would hire no former employees for several months and that it would never hire union officers, and one stated he knew PHIS was trying to break the union. In light of these facts the Board could properly conclude that PHIS was determined not to hire any of the former IBP employees because it did not want the union back in the plant.
 
 
 36
 PHIS contends that its failure to hire any of the former IBP employees was not motivated by anti-union animus but was rather a direct consequence of the employees' failure to file individual applications. It points out that as soon as individual applications were filed beginning in May, fourteen of twenty-three applicants were offered employment and twelve were hired.
 
 
 37
 An employer is of course free in most circumstances to insist upon individual employment applications. Tri State Maintenance Corp. v. NLRB, supra, 132 U.S.App.D.C. at 370, 408 F.2d at 173. In the present case, however, it is apparent that the individual application requirement was not uniformly adhered to, for the employees recruited from Omaha did not fill out applications until they arrived at the plant on the very morning they commenced work. In any event, substantial evidence most notably Sykes' specific directive to Trupe not to hire the former IBP employees supports the Board's finding that PHIS would not have hired any former IBP employees even if individual applications had been filed. Nor does the hiring which did take place beginning in May detract necessarily from this finding. Several items of evidence, already discussed, consistently reflect that PHIS intended not to hire any former IBP employees during the plant's start-up period. It is settled as a legal matter that "an employee need not follow the letter of an employer's hiring procedure where the circumstances make it clear that a rebuff would result." Sterling Aluminum Co. v. NLRB, 391 F.2d 713, 724 (8th Cir. 1968); See Virginia Stage Lines, Inc., v. NLRB, 441 F.2d 499, 504 (4th Cir.), Cert. denied, 404 U.S. 856, 92 S.Ct. 105, 30 L.Ed.2d 98 (1971); NLRB v. Valley Die Cast Corp., 303 F.2d 64, 66 n.2 (6th Cir. 1962); Piasecki Aircraft Corp. v. NLRB, supra, 280 F.2d at 585; Cf. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 365-67, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), And Banks v. Heun-Norwood, 566 F.2d 1073, 1076 (8th Cir. 1977) (analogous issue under Title VII of 1964 Civil Rights Act). The Board could properly apply this principle here.
 
 
 38
 PHIS also contends that its failure to hire former IBP employees was not a product of anti-union animus but was rather a legitimate response to legally unwarranted demands by Local P-38 and its members that PHIS hire All former IBP employees, that it recognize Local P-38 or that it accede to the terms of the collective bargaining agreement between IBP and Local P-38.
 
 
 39
 A finding of anti-union animus is not justified, and Section 8(a)(3) is not violated, when an employer refuses to hire a union member because the union member has indicated his willingness to work only on terms and conditions to which he is not legally entitled. See NLRB v. Macomb Block & Supply, Inc., 570 F.2d 1304 (6th Cir. 1978), Denying enforcement of 223 NLRB No. 194 (1976). In such a case, the employer cannot be faulted for taking the union member at his word and looking elsewhere for an employee who is willing to work on such terms and conditions as the employer is legally entitled to command. By the same token, however, the mere fact an employee requests or expresses a preference for, without insisting upon, certain terms and conditions of employment cannot serve to justify an employer's absolute refusal to hire on any terms. So too, the mere fact an employee erroneously asserts that he is legally entitled to certain terms and conditions of employment does not justify an absolute refusal to hire on any terms, unless the employer can reasonably conclude from the assertion that the employee is unwilling to work save under the terms and conditions stated. In these cases, a finding of anti-union animus may or may not be justified, depending upon the entirety of the circumstances. See Piasecki Aircraft Corp. v. NLRB, supra, 280 F.2d at 585.
 
 
 40
 Of course, the confluence of events over a given period of time will not always lend itself to a simple determination of whether a group of employees has or has not Insisted upon more than its legal due. But except in the clearest of cases an employer who adamantly refuses to hire any former employees must necessarily know that it at least comes perilously close to a violation of Section 8(a)(3). In the present case, we have carefully examined all pertinent portions of the record and have considered various conflicting inferences which might possibly be drawn therefrom. We think the case presented the Board with a close question of fact. The ALJ concluded, and the Board agreed:
 
 
 41
 There is little doubt that the Union would have preferred that the Respondents assume all of the obligations of the existing contract with IBP. In light of the Union's request to the District Court in March of 1976 that MCDB be required to take over the old contract, it is idle for the Union to pretend that it did not seek to achieve this result. It is equally clear that the Union had a fall-back or secondary position, and that this position was also made abundantly clear to the Respondents. Both Long and Peterson stated on television, the standard means of communication between these parties before the charges herein were filed, that they would accept the re-employment (sic) of their members without an assumption of the contract. In response to probing questions by newsman Max Lee, Peterson announced to the television audience that Union members would work at less than the contract rate if they could get their jobs back and would be willing thereafter to sit down and discuss with PHIS representatives the terms and conditions of their continued employment.
 
 
 42
 Without question there is evidence in the record which would support a contrary conclusion.[11] On balance, however, we cannot say that the Board's conclusion was either induced by an erroneous view of the law or not supported by substantial evidence on the record as a whole.
 
 
 43
 Accordingly, the finding that PHIS discriminatorily refused to hire any former IBP employees in violation of Section 8(a)(3) is affirmed.
 
 
 44
 Having concluded that the Board's finding of a Section 8(a)(3) violation is warranted, we now turn to the relief granted. The Board ordered PHIS to offer employment with seniority and backpay to all 83 former IBP employees. Our authority to review the remedial provisions of the Board's order is limited, since the Board has broad discretion to fashion appropriate remedies once unfair labor practices are established. NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262-63, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953). When the Board, in the exercise of its informed discretion, makes an order of restoration by way of backpay, the order should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act. NLRB v. J. H. Rutter-Rex Mfg. Co., supra, 396 U.S. at 263, 90 S.Ct. 417; NLRB v. Seven-Up Bottling Co., supra, 344 U.S. at 346-47, 73 S.Ct. 287. But the Board's remedies must be remedial, not punitive, and they must be functions of the purposes to be accomplished. Local 60, United Brotherhood of Carpenters v. NLRB, supra, 365 U.S. at 655, 81 S.Ct. 875; NLRB v. Seven-Up Bottling Co., supra, 344 U.S. at 346, 73 S.Ct. 287. An order requiring reinstatement and backpay is aimed at "restoring the economic status quo that would have obtained but for the company's (wrongdoing)." Golden State Bottling Co. v. NLRB, 414 U.S. 168, 188, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973); NLRB v. J. H. Rutter-Rex Mfg. Co., supra, 396 U.S. at 263, 90 S.Ct. 417; Local 60, United Brotherhood of Carpenters v. NLRB, supra,365 U.S. at 658, 81 S.Ct. at 879 (Harlan, J., concurring) ("The Board must establish that the remedy is a reasonable attempt to put aright matters the unfair labor practice set awry").
 
 
 45
 PHIS contends that the order exceeds the Board's remedial authority since PHIS had legitimate business reasons for not hiring en masse the entire IBP workforce. It seeks to buttress this position by pointing out that IBP and PHIS compiled a list of 20 or so "valuable" IBP employees. This argument would have considerable force were it not for the fact that the Board found, based on substantial evidence, that PHIS refused to hire Any former IBP employees In order to keep the union out. Thus, the motivating factor behind the refusal to hire was PHIS' anti-union animus. That being the case, we find the Board's remedial order to be appropriate.[12] See NLRB v. International Van Lines, 409 U.S. 48, 53, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); NLRB v. Bausch & Lomb, Inc., 526 F.2d 817, 822 (2d Cir. 1975); NLRB v. Foodway of El Paso, 496 F.2d 117, 119-20 (5th Cir. 1974); Tri State Maintenance Corp. v. NLRB, 132 U.S.App.D.C. 368, 370-71, 408 F.2d 171, 173-74 (1968); K. B. & J. Young's Super Mkts., Inc. v. NLRB, 377 F.2d 463, 465 (9th Cir.), Cert. denied, 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967); NLRB v. New England Tank Industries, Inc., 302 F.2d 273, 278-79 (1st Cir.), Cert. denied, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962), Enforcing 133 NLRB No. 25 (1961); Piasecki Aircraft Corp. v. NLRB, 280 F.2d 575, 590-92 (3d Cir. 1960), Cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961).
 
 IV.
 
 46
 The final major issue to be addressed involves MCDB's joint liability for the unfair labor practices committed by PHIS. The Board held MCDB jointly liable based on its finding that MCDB and PHIS were joint successors to IBP and that PHIS was MCDB's agent. Because we affirm the Board's finding of an agency relationship[13] we need not discuss the efficacy of the Board's joint successor conclusion.
 
 
 47
 MCDB contends it cannot be held responsible for the actions taken by PHIS since PHIS operated the plant as an independent contractor. In support of this position MCDB relies primarily on a disclaimer provision of the MCDB-PHIS contract which purports to vest total control of plant management in PHIS.[14] While this provision must be considered in determining PHIS' status, See, e. g., International Chemical Workers Union Local 483 v. NLRB, 182 U.S.App.D.C. 255, 258, 561 F.2d 253, 256 (1977), it is not controlling. See News-Journal Co. v. NLRB, 447 F.2d 65, 67-68 (3d Cir. 1971), Cert. denied, 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972).
 
 
 48
 The analysis most often employed to determine whether a person is an independent contractor is the "right to control" test.[15] Under this test various aspects of the relationship between the alleged principal and agent are considered in determining under the totality of the circumstances whether a person is an agent or independent contractor. Thus, an examination of the MCDB-PHIS relationship is required.
 
 
 49
 Prior to MCDB's hiring PHIS, Sam Davis, MCDB's principal, made "a paragraph-by-paragraph review . . . of the current collective bargaining agreement between IBP and the Union. Davis (also) made a point-by-point comparison of his . . . contract (with another union) and IBP's Mason City contract . . . ." Appendix at 21. Thus, when MCDB hired PHIS it "was well aware of the labor relations history of the plant and of the outstanding IBP-Union contract . . . (and) was also well aware that (the IBP-Union contract) contained a successorship clause." Appendix at 52. This knowledge, when coupled with other aspects of the MCDB-PHIS relationship, suggests MCDB's mutual responsibility for the unfair labor practices. See NLRB v. Somerset Classics, Inc., 193 F.2d 613, 615 (2d Cir.), Cert. denied, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635 (1952).
 
 
 50
 Two facets of the contractual relationship indicate PHIS was operating as MCDB's agent. First, PHIS received a flat fee of $800 a week plus all costs. Thus, PHIS was assured a profit whether the plant was operated successfully or not, and MCDB assumed the risk of any operational losses.
 
 
 51
 The second facet of the contractual relationship that indicates that PHIS was MCDB's agent arises from the fact that the contract restricted the way in which PHIS managed the plant. The contract provided that the beef carcasses furnished by MCDB were to be processed by PHIS in MCDB's plant, with MCDB's equipment, using supplies furnished by MCDB, and sold only to MCDB. This arrangement clearly circumscribed to a great degree any managerial discretion PHIS possessed. Cf. NLRB v. Sachs, 503 F.2d 1229 (7th Cir. 1974). Furthermore, since MCDB supplied everything needed for the production of dressed beef, PHIS was totally dependent on MCDB. This also suggests an agency relationship. See NLRB v. Somerset Classics, Inc., supra, 193 F.2d at 615.
 
 
 52
 From the record, it also appears that PHIS had to make no investment in order to receive compensation under the contract. MCDB paid PHIS $25,000 for start-up expenses and thereafter apparently paid PHIS $800 per week plus costs. This evidences an agency relationship rather than an independent contractor status. See Site Oil Co. v. NLRB, 319 F.2d 86, 89 (8th Cir. 1963).
 
 
 53
 From the foregoing we conclude that substantial evidence on the record as a whole supports the Board's finding that PHIS acted as MCDB's agent.[16]V.
 
 
 54
 The remaining contentions raised require but scant attention. MCDB complains of alleged bias on the part of the administrative law judge. PHIS does not raise the same contention and accordingly has not preserved the issue for review. In any event, the contention, which rests primarily upon alleged hostility directed by the administrative law judge at MCDB's counsel during certain Board proceedings involving neither MCDB nor PHIS, is without merit.
 
 
 55
 Similarly without merit is PHIS' contention that the administrative law judge erroneously excluded evidence which PHIS contends tended to show lack of anti-union animus, unprofitability of the plant under IBP and high absenteeism of former IBP employees. In our opinion, the evidentiary rulings of the administrative law judge were even-handed and well within the bounds of discretion vested in the administrative law judge.
 
 
 56
 The order of the Board relating to the 8(a)(1) and 8(a)(5) violations is denied enforcement by an evenly divided court; as to the remaining findings and order of the Board, the court grants enforcement.
 
 
 57
 It is so ordered.
 
 
 58
 ROSS, Circuit Judge, concurring.
 
 
 59
 I agree with the result reached by the majority as to the 8(a)(2) violations and as to the matters disposed of in sections IV and V of the main opinion. Since enforcement is being denied as to the 8(a)(1) and 8(a)(5) alleged violations, I will refrain from commenting on them.
 
 
 60
 I also agree with the determination, in the main opinion, that PHIS violated section 8(a)(3) in more than one instance and that backpay should be awarded. The evidence describing these violations is set forth in the main opinion and fully justifies a finding that PHIS was guilty of numerous violations.
 
 
 61
 It would appear that until on or about May 1, 1976, it would have been a futile gesture for the union members to make individual applications. In addition, it seems clear that it would have been a futile gesture for any of the local union officers to make application at any time thereafter. As to those employees who were rehired, no backpay is justified after the date of their reemployment.
 
 
 62
 There remains however a substantial number of former employees who did not make application at any time during the dispute or who made application and were refused reemployment. Based upon representations made in the supplemental brief of the Board filed in this court on November 17, 1978, concerning issues to be raised and determined in the compliance hearing, I agree that enforcement should be granted as to the backpay to be awarded to this last group of employees.
 
 
 63
 In its supplemental brief the Board recognizes that there may be several valid reasons for not rehiring or paying backpay to some of the former employees. It also correctly states that the burden of proving the existence of valid reasons for not rehiring each individual employee is upon the employer. NLRB v. Midwest Hanger Co., 550 F.2d 1101, 1105 (8th Cir.), Cert. denied, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977); NLRB v. Plastilite Corporation, 375 F.2d 343, 348 (8th Cir. 1967); NLRB v. Brown & Root, Inc., 311 F.2d 447 (8th Cir. 1963).
 
 
 64
 The Board indicates that at the compliance hearing it will determine whether the employees were not rehired because of anti-union animus or "Because of legitimate considerations (such) As a reduction in force, the employees unavailability for work or their willful idleness." Board supplemental brief, page 3 (emphasis supplied). "(I)t remains incumbent upon MCDB and PHIS, as the wrongdoers, to establish that their backpay liability should be tolled at an appropriate date as to each individual employee, whether Because of incapacity, lack of qualifications, or whatever legitimate reason." Board supplemental brief, page 4 (emphasis supplied). "MCDB and PHIS would also be able to mitigate their backpay liability as to all the former employees with a showing as to their interim earnings."[1] Board supplemental brief, page 3.
 
 
 65
 Based upon these representations by the Board in its supplemental brief concerning the factors to be considered in the compliance proceedings, I concur in the determination that a backpay award is justified by the 8(a)(3) violations in this case.
 
 
 66
 Chief Judge GIBSON and Judge HENLEY join in this concurring opinion.
 
 
 
 [1]
 Local P-38, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO (Local P-38) has intervened in support of the Board's order
 
 
 [2]
 In view of the fact that the plant was reacquired by IBP and the building razed in January of 1977, the only issue remaining under Section 8(a)(5) would relate to the duty of the employer to bargain over the effects of the closing
 
 
 [3]
 PHIS, which is based in Lincoln, Nebraska, was organized for the purpose of providing business operation and management services to plant owners who preferred to farm out the responsibility for the day-to-day operations of their plants
 
 
 [4]
 On January 30, Walker and plant manager Trupe prepared a list of about twenty IBP employees whom they regarded as valuable
 
 
 [5]
 Trupe had served as plant manager for IBP and was kept on the IBP payroll until February 5 or 6, at which time he went on PHIS' payroll
 
 
 [6]
 The plant normally produced 400-500 head of dressed beef in an eight-hour day. The four-hour shift on Saturday yielded only forty-two head
 
 
 [7]
 An ad placed in the local newspaper on February 16, signed by "former I.B.P. employees," stated in part: "We have repeatedly said that the entire production and maintenance force is ready and available for employment. We have stated that we would like a meeting to discuss terms and conditions of employment. This remains our position."
 
 
 [8]
 Of the employees on the PHIS payroll in September at the time of the hearing, only one was hired before February 11. Of those still working at the time of the hearing, a breakdown by date of hire during the first three months of the PHIS operation indicates as follows:
 Hired Number
 ----- ......... ------
Before February 11 .......... 1
February 11-13 .............. 8
February 16-20 ............. 25
February 23-27 .............. 2
Month of March ............. 10
Month of April .............. 2
 ------
Total--February-April ...... 52
 
 
 [9]
 The exact number may be determined at the compliance proceedings
 
 
 [10]
 Trupe's testimony was clear on this point:
 Q. What is your present recollection as to the instructions Mr. Sykes gave you?
 A. Well, basically, it was just what I said here, not to hire former employees or not to go out and solicit them.
 Q. Not to hire, not only not to solicit but not to hire former Iowa Beef Processor employees?
 A. Right.
 
 
 [11]
 Most significantly, Walker testified that Local P-38 chairman Peterson stated at the January 30 meeting: "(I)f this plant operated it was going to operate with these employees and . . . if one of them worked, all of them would work." Peterson denied making the statement, and the Board made no specific finding as to whether he did or did not. Even if we assume the statement was made, a number of factors militate against giving it controlling effect. It was made at the very meeting at which it was announced that the plant was being closed, when neither the union nor the employees had yet learned what the new owner's plans were. There is no affirmative testimony that other union representatives present at the meeting agreed with or ratified the statement, much less any indication that the employees had had an opportunity to consider for themselves where they stood and what they intended to do. The telegram sent by Long later in the day, while it did make the legally indefensible assertion that the union considered its members to be employees of a company partially owned by Davis, did not purport to state that the employees would not work unless Davis agreed to hire all of them. The telegram of February 9, the television statements of February 9 and 11, and the newspaper ad of February 16 were similarly not intransigent
 
 
 [12]
 In the compliance proceeding the Board acknowledges that petitioners have an opportunity to assert all recognized defenses related to compliance proceedings. They may do so of course, in accord with the general principles of law discussed governing this opinion
 
 
 [13]
 Initially it should be noted that common law agency principles are to be applied in determining whether PHIS is an agent of MCDB or an independent contractor. NLRB v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Thus, the Board's determination that PHIS was MCDB's agent involves a question of agency law concerning which the Board possesses "no special administrative expertise that a court does not possess." Id. at 260. Nevertheless, a reviewing court should uphold the Board's determination if the Board has chosen between two fairly conflicting views. Id. Accordingly, the Board's determination must be sustained if supported by substantial evidence. See, e. g., NLRB v. Sachs, 503 F.2d 1229, 1230 (7th Cir. 1974); NLRB v. Cement Transport, Inc., 490 F.2d 1024, 1027 (6th Cir.), Cert. denied, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); Site Oil Co. v. NLRB, 319 F.2d 86, 92-93 (8th Cir. 1963)
 
 
 [14]
 The disclaimer reads as follows:
 No agent, officer, employee, or servant of Packing House & Industrial Services, Inc., shall be deemed to be an employee agent, or servant of Mason City Dressed Beef, Inc. No agent, officer, employee, or servant of Mason City Dressed Beef, Inc., shall be deemed an employee, agent, or servant of Packing House and Industrial Services, Inc. Mason City Dressed Beef, Inc., is interested only in the results obtained under this agreement; the manner and means of conducting the work are under the sole control of Packing House and Industrial Services, Inc.
 
 
 [15]
 The "test" has been frequently articulated as follows:
 In determining the status of persons alleged to be independent contractors, the Act requires the application of the "right to control" test. Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment. On the other hand, where control is reserved only as to the result sought the relationship is that of independent contractor. The resolution of this question depends upon the facts of each case and no one factor is determinative.
 NLRB v. Sachs, 503 F.2d 1229, 1233 (7th Cir. 1974).
 Accord, NLRB v. Cement Transport, Inc., 490 F.2d 1024, 1027 (6th Cir.), Cert. denied, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); Frito-Lay, Inc. v. NLRB, 385 F.2d 180, 187 (7th Cir. 1967); NLRB v. A. S. Abell Co., 327 F.2d 1, 4 (4th Cir. 1964); See also Site Oil Co. v. NLRB, 319 F.2d 86, 88, 91 (8th Cir. 1963) (joint employer issue).
 
 
 [16]
 MCDB argues there is no evidence that it directly intervened in the operation of the plant and therefore the agency finding cannot be sustained. The decision to reopen the plant on February 7, however, was jointly made by MCDB and PHIS. Were this court faced with the contention that MCDB's liability is based on its status as a joint employer, the express contract terms and the paucity of direct intervention by MCDB in labor decisions would probably preclude holding MCDB liable. See, e. g., International Chemical Workers Union Local 483 v. NLRB, 561 F.2d 253 (D.C.Cir. 1977); Site Oil Co. Missouri v. NLRB, 319 F.2d 86 (8th Cir. 1963). But MCDB's liability is based on the existence of an agency relationship. Therefore, the relative absence of direct intervention by MCDB is not controlling. Furthermore, agency principles are to be liberally construed in this context. See 29 U.S.C. § 152(13); McGraw-Edison Co. v. NLRB, 419 F.2d 67, 72 (8th Cir. 1969)
 
 
 [1]
 I assume the Board will require the cooperation of the employees in determining the amount of back wages to be offset by interim earnings since much of that information is known only to the employees. The burden should be placed upon the individual employees in the first instance to file their claims showing therein any mitigating earnings during the period in question