United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1643

_____

Pace Industries, Inc., doing business as &ast;
Precision Industries, Inc.; Pace &ast;
Industries, Inc.; Pace Industries, Inc., &ast;
doing business as General Precision &ast;
Tool & Die, Inc., Pace Industries, doing &ast;
business as Automatic Castings, Inc., &ast;
&ast;
   Petitioners, &ast;
&ast;
  v. &ast;
&ast;
National Labor Relations Board, &ast;
&ast;
   Respondent. &ast;

_____     Petition for Review
of the Decision and
No. 96-1943     Order of the National
Labor Relations Board.
_____

Pace Industries, Inc., doing business as &ast;
Precision Industries, Inc.; Pace &ast;
Industries, Inc.; Pace Industries, Inc., &ast;
doing business as General Precision &ast;
Tool & Die, Inc., Pace Industries, doing &ast;
business as Automatic Castings, Inc., &ast;
&ast;
   Respondents, &ast;
&ast;
  v. &ast;
&ast;
National Labor Relations Board, &ast;
&ast;
   Petitioner. &ast;

_____

Submitted: December 11, 1996

Filed: July 1, 1997
_____

Before WOLLMAN and MURPHY, Circuit Judges, and TUNHEIM,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

The National Labor Relations Board (Board) found that Precision Industries, Inc. (Precision)[2], violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (3), and (5). The Board found that Precision refused to hire employees formerly employed by its predecessor, Universal Die Casting, Inc. (Universal Die), because those employees were represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (the union); that Precision did so in order to avoid recognizing and bargaining with the union; and that Precision did in fact refuse to recognize and bargain with the union and unilaterally implemented changes in employment conditions. Precision petitions for review of the Board's decision and order, and the Board cross petitions for enforcement of its order. We deny the petition for review and grant enforcement of the order.

_____

[1]The HONORABLE JOHN R. TUNHEIM, United States District Judge for the District of Minnesota, sitting by designation.

[2]At the time of the alleged violations, Precision was an entity separate from Pace Industries, Inc., although the two companies had some common owners. Precision has since merged into Pace and now operates as a division of Pace.

# I.

Pace Industries, Inc. (Pace), is an aluminum die casting company located in Harrison, Arkansas, and owned by James Keenan and Bob Gaddy. In 1988, Keenan and Gaddy sought to expand their business and, along with another Pace officer, Jim Alford, formed Precision. In October of 1988, Precision agreed to purchase two plants owned by Universal Die, one located in Little Rock and the other in Malvern, Arkansas. Universal Die-Malvern was unionized, while Universal Die-Little Rock was not.[3] Gaddy testified that Precision was interested in Universal Die because Universal Die had been profitable, had a reputation for quality work, and would serve as a basis for future growth. At about the same time as the Universal Die acquisition, Gaddy and Keenan, along with three others, also purchased two other non-union die casting companies in Alabama. In January of 1990, Gaddy and Keenan purchased an additional non-union die casting company.

During the week of October 10, 1988, Precision ran newspaper advertisements soliciting job applications from the general public for employment with Universal Die-Malvern. The employees at Universal Die-Malvern were informed that to secure continued employment they would have to submit applications. On October 14, 1988, Universal Die-Malvern ceased operations and discharged all of its employees. Universal Die-Malvern plant manager, Mike Nowak, continued in his position, as did the majority of all managerial and salaried employees. The Universal Die plant in Little Rock continued operations. Although its employees were required to complete an application, all but two or three of those employed before the purchase by Precision were rehired without any thorough review of the applications.

Precision implemented an elaborate hiring procedure at the Malvern plant, which cost between $75,000 and $100,000 to implement, caused an interruption in production, and resulted in a six to eight week hiring process, which Precision admitted

---

[3]Universal Die-Little Rock closed in 1989. None of the employees of that plant are alleged discriminatees in this proceeding.

jeopardized its commitments to its customers.  Applicants were required to complete a nineteen-page application, which included an eight-page section requesting information such as the applicant's name, address, education, and work history.  The application included a five-page medical questionnaire section, followed by a six-page short-answer essay section.  Before former Universal Die employees' applications were considered, their personnel files were reviewed, with a notation being made concerning the employees' attendance records, disciplinary actions, and medical limitations.

Applicants who made it through the initial screening and review were then required to undergo a battery of verbal, numerical, and dexterity tests.  Dr. Mamdouh Bakr, an industrial engineer whose expertise was in retraining existing employees and not in hiring new employees, was hired to assist in this phase of the hiring process.  Malvern plant manager Nowak and Precision's industrial engineer, David Watson, were also recruited to help in this phase of the process.  Neither Nowak nor Watson appears to have had any experience in devising and applying tests designed to find suitable die casters.

Applicants who applied for tool and die and maintenance positions were subjected to the National Tool and Machine Association (NTMA) tests, which consisted of mechanical comprehension, verbal, mathematics, and problem-solving tests.   Although the NTMA tests are not ordinarily given to maintenance employees, maintenance applicants were also given NTMA tests, as well as an applied electricity test.  It is not clear who set the cut-off score for the NTMA tests or how that number was determined.

Other applicants were given Personnel Tests for Industry (PTI) and dexterity tests.  The verbal part of the PTI consisted of fifty multiple-choice questions on defining words and identifying the non-relationship of words and phrases.  The numerical test consisted of thirty mathematical problems in areas of basic addition, subtraction, division, and multiplication.  The scores on these two tests were added

together, and the passing score was apparently arbitrarily set at thirty. It appears, however, that the cut-off scores were not set until after Nowak and Watson had reviewed a number of the test scores. A five-point bonus was given to former Universal Die employees.

Dr. Bakr designed the dexterity tests, which purportedly tested for speed and accuracy. The tests included a "pegboard test," which consisted of inserting wooden dowels into holes; a "sorting card test," which entailed arranging cards according to the number of holes per card; and a "paint test," which required the applicant to put flat steel washers onto spokes and then remove them. Watson, who admittedly had no testing expertise, was given the responsibility of establishing time limits and penalties for the dexterity tests.

New applicants who successfully completed these tests advanced to the next phase of the hiring procedure -- physical examinations and x-rays. Former Universal Die employee-applicants, however, were further reviewed before advancing to this phase. Even after passing the physical and x-ray examinations, the former Universal Die employees' personnel files were again reviewed in order to determine their medical limitations.

Although employees at non-unionized Universal Die-Little Rock were required to complete the application, they were subjected to neither the battery of tests nor the physical examinations. In addition, the plant manager for Universal Die-Little Rock, Roger Connor, had complete discretion in hiring and in fact rehired nearly all of the former employees at that plant. The employees of the three other non-union die casting companies acquired by Gaddy and Keenan were retained without having to complete applications and without having to undergo tests or physical examinations.

Connor and Little Rock sales associate, Debbie Key, questioned Precision officials about the differences in hiring procedures. Although Connor was initially told

that the Malvern plant was not as busy as the Little Rock plant and had higher insurance costs, those reasons were never advanced during the investigation or at trial. Rather, Precision officials testified before the administrative law judge (ALJ) that the reason for the difference was the institution of new operating procedures. Connor testified that he asked whether the hiring procedures were an effort to keep out the union, and that his suspicions were later confirmed by Precision officials. Precision officials never denied Connor's accusations, but testified that they told Connor the union was not the reason. Connor and Key were later fired for alleged differences in business philosophies.

Of the 103 former Universal Die-Malvern employees that applied, only some twenty-two were ultimately rehired. Sixty-two of those that were rejected are alleged discriminatees in this action, which was brought by the union and charged Precision with engaging in unfair labor practices. The ALJ concluded that Precision refused to hire those sixty-two former Universal Die-Malvern employees because of their union affiliation and in order to avoid recognizing and bargaining with the union, in violation of sections 8(a)(1) and (3) of the Act. In addition, the ALJ found that Precision violated section 8(a)(5) of the Act by unilaterally changing the preexisting conditions of employment.

The ALJ's proposed remedy included a directive that Precision offer the discriminatees reinstatement, make them whole for any loss of earnings, recognize and bargain with the union, and rescind the unilateral changes that were implemented. The ALJ also recommended that Precision cease and desist from failing and refusing to hire former Universal Die-Malvern employees; from refusing to recognize and bargain with the union; from unilaterally setting and changing terms and conditions of bargaining unit employees; and from interfering with, restraining, or coercing employees in the exercise of their rights under section 7 of the Act, which includes the right to organize, join,

form, or assist any union.  The Board affirmed the ALJ's rulings, findings, and conclusions, subject to some modifications, and adopted the recommended order.[4]

## II.

Precision's first argument is that res judicata bars enforcement of the Board's order.  Precision argues that the claims now before the court could have been brought in an earlier lawsuit that the union filed in district court under section 301 of the Act, which alleged that Precision had breached the purchase agreement by refusing to pay plan-provided health and life insurance benefits established in the collective bargaining agreement (CBA), thereby violating the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et. seq.  The district court found that Precision had not agreed to assume the insurance benefits program and dismissed the action.

"Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."  Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n. 5 (1979).  Although res judicata bars not only relitigation of claims that a party raised, but also claims the party could have raised in the prior adjudication, see Allen v. McCurry, 449 U.S. 90, 94 (1980), Precision's assertion that the unfair labor practices claim could have been brought in the earlier proceeding is without merit.

The allegation of unfair labor practices is not a claim that could have been raised in the earlier proceeding, for an allegation of unfair labor practices brought pursuant to

---

[4]The Board rejected the ALJ's statement that he was compelled to find a violation of the Act because he found Precision's witnesses not to be credible.  The Board pointed out that if an ALJ discredits testimony, the ALJ may infer that reasons other than those proffered were the motivation behind the hiring procedures, but is not required to do so.  The Board, however, affirmed the ALJ, agreeing that anti-union animus was shown through direct evidence as well.

29 U.S.C. § 158 of the Act is a claim within the exclusive jurisdiction of the Board. See Sears, Roebuck and Co. v. Solien, 450 F.2d 353, 355 (8th Cir. 1971) ("It has long been settled that jurisdiction to prevent persons from engaging in unfair labor practices is exclusively vested in the Board and courts of appeals."). Precision argues, however, that although the district court has no jurisdiction to hear a claim of unfair labor practices, the union could have styled its claim of unfair labor practices as a breach of the CBA, which the district court would have had jurisdiction to hear pursuant to 29 U.S.C. § 185. Precision's reasoning is flawed, for "[W]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245 (1959)(emphasis added). The unfair labor practices alleged in this claim are more than just "arguably" subject to section 8 of the Act; they fall squarely within its purview, and the district court would have been required to defer to the Board for adjudication of those alleged violations.

## III.

Precision contends that substantial evidence does not support the Board's finding of unfair labor practices. As a successor employer, Precision is generally free to set its own terms and conditions of employment. Because Precision has continued the predecessor's business in substantially the same form, however, Precision is obligated to bargain with the union if a majority of Precision's work force were also the predecessor's employees. See U.S. Marine Corp. v. NLRB, 944 F.2d 1305, 1315 (7th Cir. 1991) (citing Fall River Dyeing and Finishing Corp. v. NLRB, 482 U.S. 27, 47 (1987)). Discriminatory hiring decisions and a refusal to employ former employees in order to avoid bargaining obligation constitute a violation of section 8(a)(3) of the Act. Id. The question, then, is whether the hiring procedures reflected an attempt by Precision to avoid its bargaining obligation.

Even though an employer may have legitimate justifications for its actions, such actions may still constitute unfair labor practices if anti-union animus was also a motivating factor.[5]  In cases where mixed or dual motives exist, we apply the test set forth in Wright Line, 251 N.L.R.B. 1083 (1980), to determine whether the employer has engaged in unfair labor practices:

> First, we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision.  Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

Id. at 1089 (footnote omitted).  The Board may infer unlawful motivation from direct and circumstantial evidence and is "'permitted to draw reasonable inferences, and to choose between fairly conflicting views of the evidence.'"  Concepts and Designs, Inc. v. NLRB, 101 F.3d 1243, 1245 (8th Cir. 1996) (citations omitted).

We afford "great deference to the Board's affirmation of the ALJ's findings." Town and Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997).  The Board's order will be enforced "if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Id.  Although in the past we have applied a "shock the conscience" standard of review

---

[5]The ALJ alternatively found, and the Board agreed, that general counsel had established that Precision's sole motivation in implementing the hiring practices was to discriminate against employees based on their union affiliation.  In light of our conclusion that substantial evidence supports a finding of mixed motives, we do not address this issue.

to an ALJ's credibility determinations, we have recently indicated a preference for considering credibility determinations "with the rest of the NLRB's factual findings

under the general substantial evidence test derived from <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951)." <u>Id.</u> We conclude that the record reveals that the Board's findings and its credibility determinations are supported by substantial evidence.

## A. Substantial evidence supports the Board's credibility determinations.

The ALJ conducted an exhaustive analysis of the testimony and made detailed findings as to the credibility of the witnesses, as evidenced by his fifty-two page opinion. In crediting Connor's and Key's testimony, the ALJ found that while there were some variations in their accounts of the events that took place, these inconsistencies were minor and did not relate to the substance of their allegations. Other evidence tending to detract from Connor's and Key's credibility was likewise insubstantial and was refuted by evidence to the contrary. For instance, although there was testimony that Connor was bitter about being fired and that he wished to "get back at" Precision, that evidence was offset by the fact that Connor first raised the issue of the discrepancy in hiring procedures sometime in October of 1988, which was prior to his March 1989 termination. Connor's willingness to cooperate in helping with Precision's customers even after his termination further refutes the assertion that his accusations were motivated by revenge. The ALJ remarked that during their testimony neither Connor nor Key appeared to harbor animosity or bitterness toward Precision. Furthermore, Connor's credibility and the veracity of his allegations are bolstered by the fact that even after Connor questioned Precision about its motives in implementing the hiring procedures, he was made vice president of Precision and given a pay raise.

We also conclude that sufficient evidence exists to affirm the ALJ's decision to discredit the testimony of Alford, Gaddy, and Nowak. These witnesses' accounts of events are not only self-contradictory, but at times also contradict each other. In addition, even after the decision had been made to close the Little Rock facility, Alford

and Gaddy admittedly lied to Connor about the possibility of the Little Rock plant remaining open.

**B.    Substantial evidence supports the Board's finding that anti-union animus was a motivating factor behind Precision's hiring decisions.**

We also conclude that substantial evidence supports the Board's finding that anti-union animus was a motivating factor in Precision's implementation of the hiring procedure.

Alford testified that Precision officials learned in August or September of 1988 that if it hired more than fifty percent of Universal Die's work force, it would have to bargain with the union.  It was during this time period that Precision decided to implement the hiring procedure.

As indicated earlier, when first questioned by Connor about the differences in hiring procedures, Alford gave as a reason the fact that the Malvern plant was not as busy as the Little Rock plant and that higher insurance costs mandated the physical examinations at Malvern.  This explanation, however, was never asserted during the investigation or at trial.  Connor testified that the next time he questioned Alford about the reason for the different procedures, Connor remarked that it was to get rid of the union.  Connor testified that Alford never denied the statement, but instead told Connor to never say that.  Connor testified that three or four subsequent conversations about the hiring procedures at Malvern revealed that it was an attempt by Precision to keep its new work force to less than fifty percent former Universal Die employees so as to avoid having to bargain with the union.  Precision's witnesses never explicitly denied making remarks about getting rid of the union, testifying only that they "didn't remember" or were "not aware" of those statements.

Connor also testified to conversations with Nowak in which they discussed the fifty percent ratio. Connor stated that he and Nowak frequently discussed the progress of the hiring procedure and specifically the number of former Universal Die employees that had been hired up to that point. Connor recalled that about a month after Precision had purchased Universal Die, Nowak told him that things looked good because only seventeen of the forty-three employees hired were former Universal Die employees. Connor also stated that Nowak told him that the less Connor knew, the better, because they would ultimately end up going to court.

Connor also testified about a meeting with Nowak and Universal Die's former owner, Lou Zachery. Connor testified that he heard Zachery say that union representation was costly and caused many headaches and that he had made a mistake in not getting rid of the union at Malvern. When questioned about these remarks, Nowak did not contradict them, but merely stated that Precision's relationship with the union was good.

Anti-union motivation is also evident from the reasons why many of the alleged discriminatees were not hired. Eight of the alleged discriminatees were rejected because they had entered too high a wage rate on their applications. Several of these, however, also indicated that they would accept a reasonable or compatible rate. Three were not hired because their medical information was incomplete; however, all three had been Universal Die employees for the previous eleven years and all of the requested information was contained in their personnel files. One applicant was rejected because he failed to list his industry experience; he had been an employee with Universal Die for twenty-three years and had indicated that he had a total of forty years' maintenance experience. The ALJ noted that six non-Universal Die applicants had been hired despite similar omissions in their applications. An additional seven former Universal Die employees were rejected because of medical limitations. Some of the purported limitations were unrelated to positions for which the applicants applied, however, and some of these applicants were rejected despite their past

demonstrated ability to perform the job. Eight non-Universal Die employees were hired even though they had attained test scores for which Universal Die applicants were eliminated. Eight Universal Die applicants were rejected because they failed the back x-ray, even though they were actively employed before the October 14 closing. Two union officers that passed the tests were never notified to take the physical exams and thus were not considered for employment.

Viewing the record as a whole, then, we conclude that substantial evidence exists to support the ALJ's finding of anti-union animus, and the first element of the Wright Line test has therefore been satisfied.

## C. Precision has not met its burden of showing that it would have taken the same action absent its anti-union animus.

Gaddy and Alford testified that the hiring procedure was implemented in large part because of Precision's desire to implement statistical process control (SPC), a process which relies less on inspections at the end of the production process and more on the involvement of the workers to detect problems during production and at the earliest possible stage. The ALJ discredited that testimony not only because of Gaddy's and Alford's pecuniary motives and contradictory testimony, but also because they admittedly never advanced that reason during the entire investigation. Moreover, Alford never stated that SPC was the reason in his affidavit to the Board, either initially or when given the chance to review his affidavit and make additions or deletions. The ALJ also pointed out that although SPC-capability was allegedly such an overriding concern, neither Gaddy nor Alford questioned anyone about SPC-capability prior to purchasing Universal Die. Moreover, the assertion that an entire new workforce was needed in order to implement SPC is refuted by Gaddy's and Alford's testimony that Universal Die was purchased because they thought it was SPC-capable. Furthermore, other evidence indicated that an SPC program was already to some extent in place at Universal Die-Malvern.

-14-

Precision also claims that its change in operations from mostly proprietary work to all custom work warranted the hiring of a new work force and created the need for the hiring procedures used. Nowak's testimony, however, reveals that he was given instructions to devise a hiring procedure in September of 1988, which according to the ALJ's findings was well in advance of any discussions that Nowak had about Universal Die employees' new job functions. Another fact that belies the assertion that custom work warranted the new work force is that, according to Precision's own witnesses, the only difference between custom and proprietary work is ownership of the dies -- the die is owned by the customer in custom work, while Precision owns the dies for proprietary work. In addition, Alford admitted that the same basic jobs that were done at Malvern before the sale continued to be performed there even after the sale to Precision. Those facts, along with the facts that Malvern was already doing some custom work and Little Rock was doing all custom work, refute Precision's assertion that a new work force was mandated by the change in operations.

The alleged need for the physical and x-ray examinations is contradicted by the fact that the new castings that were to be made at Precision were only a few pounds heavier than the previous castings and that many of them were very light, weighing only one to three pounds.

Alford stated that the reason for the testing and examinations was that with the changes planned at Universal Die-Malvern, the work and equipment would be more sophisticated and the required engineering and intellectual capacity of the workers would be greater. Alford admitted, however, that the work at the Alabama plants, which were both non-union, involved greater degrees of sophistication and engineering, yet no testing of any sort was done there. Maintenance applicants were required to take the NTMA tests despite the fact that those tests are not recommended for testing in that position. The NTMA tests are appropriate to test machinists and tool and die makers, yet the NTMA tests were not given to such employees at the non-unionized Alabama plants, where manufacturing and major repairing of dies was done.

-15-

The dexterity tests were devised by Bakr, Nowak, and Watson, none of whom had experience in developing and applying tests for hiring employees for die casting positions. There was no evidence to show that Bakr was instructed by Alford or Gaddy to design tests that would specifically identify SPC qualities, and the tests were not shown to test for abilities relating to functions of either SPC or non-SPC die casting. The passing scores for the tests were likewise arbitrary and were established only after more than 200 of the tests had been reviewed.

Significantly, although Watson admitted that experience was, overall, the best indicator of job performance, experience was in no way factored into the screening process.

We conclude that substantial evidence supports the Board's finding that the proffered reasons for implementing the hiring procedure were largely pretextual and that Precision did not sustain its burden of showing that it would have taken the same action even absent the unlawful motivation.

**III.**

Precision contends that the Board's remedy exceeds its authority. In reviewing this claim, we keep in mind that the Board has "primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99 (1984). The "Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32 (1969). The remedy will be enforced "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec.& Power Co. v. NLRB, 319 U.S. 533, 540 (1943); Packing House and Indus. Serv., Inc. v. NLRB, 590 F.2d 688, 697 (8th Cir. 1978).

Ordering Precision to offer reinstatement and back pay is plainly within the Board's power, as it comports with the plain language of the Act. Section 10(c) of the Act provides that the Board may order that a violator "cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies [of the Act]." 29 U.S.C. § 160(c).

The order likewise comports with the policies underlying the Act. The goal of a remedial order is to restore "the situation, as nearly as possible, to that which would have obtained but for the [unfair labor practices]." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1940). Ordering Precision to offer reinstatement and backpay to the discriminatees is directly aimed at and fulfills that purpose. See Packing House and Indus. Serv., Inc., 509 F.2d at 697. ("An order requiring reinstatement and backpay is aimed at 'restoring the economic status quo that would have obtained but for the company's [wrongdoing].'") (citation omitted); see also Sure-Tan, Inc. v. NLRB, 467 U.S. at 900 ("the general legitimacy of the backpay order as a means to restore the situation 'as nearly as possible, to that which would have obtained but for the illegal discrimination,' is by now beyond dispute." (citation omitted)).

Rescinding the unilateral changes in employment conditions likewise comports with the polices of the Act. In fashioning the order, the ALJ correctly presumed that without the discriminatory hiring practices the union's majority status would have continued, which in turn would have required that Precision bargain with the union before making changes in employment terms. See U.S. Marine Corp., 944 F.2d at 1322. The Board's remedy

is based on the established principles applicable to successors who discriminate in order to avoid a bargaining obligation; such employers lose the right to set initial terms and conditions of employment and may be ordered to rescind any changes in those

terms and compensate employees for losses in order to put them in the position they would have been but for the employer's unlawful conduct.

Id. at 1323.

We have reviewed the remainder of the Board's remedy and conclude that it does not transgress the authority conferred upon the Board by the Act.

The petition for review is denied. Tthe Board's order is enforced in its entirety.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.