**MASTELL TRAILER CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 81–2186.

United States Court of Appeals,
Eighth Circuit.

Submitted May 19, 1982.

Decided July 12, 1982.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Lynne E. Deitch, Atty., N. L. R. B., Washington, D. C., for respondent.

Edward W. Gale, for O'Neill, Burke & O'Neill, Ltd., St. Paul, Minn., for petitioner.

Before BRIGHT and JOHN R. GIBSON, Circuit Judges, and HARRIS,* Senior District Judge.

* OREN HARRIS, United States Senior District Judge for the Western and Eastern Districts of    Arkansas, sitting by designation.

BRIGHT, Circuit Judge.

Mastell Trailer Corporation (Mastell), of St. Paul, Minnesota, closed its trailer repair shop and parts department on June 11, 1980, after the president of the corporation had learned that the employees had joined the Union (District No. 77, International Association of Machinists and Aerospace Workers, AFL–CIO). As a result of the closing, the Union charged Mastell with unfair labor practices and alleged that Mastell and an affiliated business, Instant Warehouse Corporation (IWC), constituted a single business enterprise and a single employer under the Act.

The National Labor Relations Board (Board) determined that Mastell had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976) (the Act), by interrogating employees about union activities, by threatening employees with the closing of the shop and loss of their jobs because of their union activities, and by threatening employees with bodily injury because of their union activity.[1] Further, the Board approved the administrative law judge's finding that Mastell and IWC constituted a single integrated business enterprise and employer within the meaning of the Act, and that the enterprise had violated sections 8(a)(1) and (3) of the Act, see 29 U.S.C. § 158(a)(1), (3)(1976), by discharging eleven employees on June 11, 1980, because of their union activities.

The Board ordered Mastell and IWC to desist from their unfair labor practices and required them to pay the discharged employees backpay from June 11, 1980, the date of termination, to the date of their employment or waiver of employment with Midway Trailer Service (MTS).[2]

Mastell petitions this court for review, challenging the Board's determination that Mastell and IWC constituted a single integrated enterprise, as well as the validity of the backpay award. We affirm the Board's determination that Mastell and IWC constituted a single integrated enterprise, but vacate and remand the backpay award for further consideration.

I.  *Discussion.*

A.  *Single Employer.*

■ The Board may treat nominally separate but closely related enterprises as a single employer under the Act. *See Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *Industrial Personnel Corp. v. NLRB,* 657 F.2d 226, 227–28 (8th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982). In determining whether two enterprises constitute a single employer, the Board should examine

whether the total relationship of two nominally separate businesses reveals:

(1) some functional interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

[*Miscellaneous Drivers and Helpers Union, Local No. 610 v. NLRB,* 624 F.2d 831, 833 (8th Cir. 1980) (*per curiam*) (quoting *Pulitzer Publishing Co. v. NLRB,* 618 F.2d 1275, 1279 (8th Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980)).]

---

1. The Board approved the finding of the administrative law judge "that Instant Warehouse and Mastell Trailer Corporation are affiliated businesses with common officers, ownership and operations, and that the two Companies constitute a single integrated business enterprise with a common labor policy with respect to its shop, parts and fabrication employees, and drivers."

2. On August 12, 1980, Mastell sold its parts inventory to two former supervisors, who be-

gan operating Midway Trailer Service, Inc. (MTS). MTS repairs trailers and sells parts out of the same location as Mastell, and shares the rent and utilities. The Union agreed with MTS not to seek remedial action requiring reopening of the repair shop and parts department, reinstatement of the discharged employees, or recognition of the Union by Mastell, in return for MTS's agreement to recognize and bargain with the Union, as well as to hire several of the discharged employees.

The Board makes an essentially factual determination which this court will affirm if supported by substantial evidence. *NLRB v. C. K. Smith & Co.*, 569 F.2d 162, 164 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978).

■ The facts amply support the Board's finding that Mastell and IWC constituted a single employer for purposes of the Act. According to the record, David Mastell founded and originally wholly owned both companies. Although he later sold twenty-five percent of IWC, he retained the remaining seventy-five percent. The evidence also indicates that the operations shared a common management and common office space with Mastell paying rent for the entire facility. In addition, the record reveals that Mastell employees worked for IWC, and that IWC did not have any separate employees. Mastell employees received the same compensation, had the same supervision, and worked under the same conditions of employment whether they performed work for Mastell or IWC.

### B. *Backpay Award.*

The record in this case indicates that Mastell's repair shop and parts department had been failing for many months because of adverse business conditions. Mastell showed a net profit of $50,000 for the fiscal year ending November 30, 1979, but lost two of its largest accounts in January 1980. As a result, repairs and the sale of repair parts decreased substantially.[3]

Because of its deteriorating financial condition, Mastell made substantial changes in its operation to reduce expenses. It closed its overflow repair shop, cut the president's salary by sixty percent, cut leadmen and office wages, and laid off three company employees. Mastell did not lay off repair workers, however, out of consideration for those employees.

In May 1980, Mastell's accountant advised closing the business and liquidating the inventory. In early June, after Mastell had an accumulated loss of $103,000 for the first seven months, its banker advised liquidation of as much of the inventory as possible. The record, therefore, indicates that Mastell was clearly failing and could not continue its operations in the absence of a quick business upturn. On June 11, David Mastell closed the repair shop and parts department after learning that his employees had decided to join the Union.

After a hearing, the administrative law judge awarded the discharged employees backpay from the date of their discharge to the date of employment or waiver of employment with MTS. In making the backpay award, the administrative law judge noted that Mastell had not cut benefits to its shop employees prior to closing, and that David Mastell had indicated to employees in March that the repair shop continued to fare reasonably well in spite of the high interest rates on the extensive inventory and the downturn in sales. He suggested that Mastell offered its economic defense as a smokescreen for antiunion animus in discharging the shop employees.

■ The record establishes that David Mastell's knowledge that his employees had joined the Union triggered the discharges two days later. Ordinarily, reinstatement[4] and backpay would constitute a proper remedy. Here, however, Mastell's financial plight demonstrates that it would not have operated for very long. We cannot ignore these basic economic facts.

This court has only limited authority to review a backpay award.

The Board possesses broad discretion to fashion appropriate remedies once an un-

---

3. The monthly statements of income and expenses showed a steady deterioration of Mastell's economic health:

| For Period Ending | Accumulated Loss |
| --- | --- |
| December 31, 1979 | $ 21,108.43 |
| February 28, 1980 | $ 83,686.20 |
| April 30, 1980 | $ 80,947.67 |
| May 31, 1980 | $103,495.20 |
| June 30, 1980 | $121,323.27 |
| July 31, 1980 | $147,172.21 |
| August 30, 1980 | $172,121.18 |
| September 30, 1980 | $186,426.93 |
| October 30, 1980 | $202,908.44 |

4. The Union did not seek reinstatement be-

fair labor practice is established, and our authority to review the remedial provisions of the Board's order is a limited one. *See NLRB v. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 262–63, 90 S.Ct. 417 [420], 24 L.Ed.2d 405 (1969); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398 [405], 13 L.Ed.2d 233 (1964); *Packing House and Industrial Services v. NLRB*, 590 F.2d 688 at 697 (8th Cir. 1978). Regarding a backpay order, the Supreme Court has said:

> When the Board, 'in the exercise of its informed discretion,' makes an order of restoration by way of back pay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' [*NLRB v. Rutter-Rex Mfg. Co., supra,* 396 U.S. at 263, 90 S.Ct. at 420.]

> [*NLRB v. J. S. Alberici Construction Co.*, 591 F.2d 463, 468 (8th Cir. 1979).]

As we view the record, it justifies a backpay order for a short period of time. Because Mastell's financial condition continued to deteriorate during June, July, and August, the record does not appear to support a backpay award for August. The award of backpay to August lacks evidentiary support, and, therefore, appears punitive in nature. *See Packing House and Industrial Services, Inc. v. NLRB*, 590 F.2d 688, 697 (8th Cir. 1978).

II. *Conclusion.*

Accordingly, we enforce the Board's order in part, but vacate and remand the backpay issue to the Board. The Board should employ an economic analysis to determine when Mastell, in the exercise of reasonable business judgment and, with appropriate concern for the welfare of its employees, would have been forced to close its repair shop and parts department. Backpay should then be computed from the date of actual discharge to the date the employees would have been discharged in the absence of antiunion animus.

cause of its agreement with the successor oper-

Each party shall pay its own costs on appeal.

ation, MTS. *See supra* note 2.