[Cite as *Howard v. Bobby D. Thompson, Inc.*, 2011-Ohio-3503.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

DAVID E. HOWARD                    :

     Plaintiff-Appellant              :                C.A. CASE NO.    24357

v.                                 :                T.C. NO.    10CV703

BOBBY D. THOMPSON, INC., et al.    :                (Civil appeal from
                                                     Common Pleas Court)

     Defendants-Appellees            :

                                   :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___15th___ day of ___July___, 2011.

. . . . . . . . . .

KENNETH J. HEISELE, Atty. Reg. No. 00078827 and JOHN R. FOLKERTH, JR., Atty. Reg. No. 0016366, 109 North Main Street, 500 Performance Place, Dayton, Ohio 45402
     Attorneys for Plaintiff-Appellant

THOMAS A. DIERLING, Atty. Reg. No. 0074438, 5020-B College Corner Pike, Oxford, Ohio 45056
     Attorney for Defendants-Appellees

. . . . . . . . . .

DONOVAN, J.

{¶ 1} Plaintiff-appellant David E. Howard appeals a decision of the Montgomery

County Court of Common Pleas, General Division, sustaining the motion for summary judgment of defendant-appellees Bobby D. Thompson, Inc. (hereinafter referred to as "BDT") and Bobby D. Thompson (individually referred to as "Thompson"). The trial court issued its decision sustaining appellees' motion for summary judgment on October 27, 2010. Howard filed a timely notice of appeal with this Court on November 23, 2010.

I

{¶ 2} In 1996, Howard began working for BDT. BDT is a privately owned company which performs solid waste and recyclable collection services. BDT essentially acts as a subcontractor to former defendant Rumpke, performing waste management and disposal services within a specified region with specified collection routes. Although Howard was hired and employed by BDT, he was required to acknowledge receipt of Rumpke's employment policies, including its attendance policy, return-to work policy, vacation policy, and, most importantly, its policy relating to the Family and Medical Leave Act (hereinafter "FMLA"). As an employee at BDT, Howard drove a garbage truck with Rumpke logos, abided by Rumpke's policies and procedures, and wore Rumpke uniforms. We also note that BDT's only office is located within Rumpke's truck depot at 1932 East Monument Street in Dayton, Ohio. In addition to sharing office space, BDT also shares a phone number with Rumpke at the Dayton depot.

{¶ 3} On April 22, 2009, Howard suffered a work-related injury to his shoulder. Howard asserts that he informed his supervisor, Ron Head, of the injury. The record establishes that Head did not document Howard's injury nor submit an incident report. The record also establishes that Howard did not notify BDT or any of his supervisors that he

intended to file a worker's compensation claim nor did he file a claim as a result of his injury at that time.

{¶ 4} In his affidavit, Thompson alleges that he was not aware of any injuries suffered by Howard on April 22, 2009. Rather, Thompson stated in his affidavit that the only injury that Howard advised him of occurred on the weekend immediately prior to Monday, March 30, 2009, when Howard missed work. Howard told Thompson that he hurt his shoulder at some point during the prior weekend. Thompson further stated that none of the supervisors at BDT informed him that Howard suffered a work-related injury on April 22, 2009.

{¶ 5} Howard stated that on September 9, 2009, he was absent from work recuperating from his shoulder injury on the orders of his physician. Howard stated that he called BDT's office in order to inform Thompson that he would provide medical documentation for his absence from work and that he planned on filing a workers' compensation claim because of his shoulder injury. Howard stated that Thompson remarked that he would deny any claim for workers' compensation. In his affidavit, Thompson testified that no such conversation ever took place, and Howard never told him that he intended to file a workers' compensation claim.

{¶ 6} Thompson stated that on September 11, 2009, he called Howard to his office to discuss disciplinary action that was being taken against him for two recent, unexplained absences on August 14, 2009, and August 24, 2009. With respect to the absence on August 14, 2009, Howard told Thompson that he had to give his girlfriend a ride to the doctor. As for the absence on August 24, 2009, Howard stated that he had to attend a meeting with his

probation supervisor. At the end of the meeting, Thompson suspended Howard pending verification of his explanations for the absences. In his affidavit, Howard stated that he informed Thompson that he intended to apply for unemployment benefits while he was suspended.

{¶ 7} On September 21, 2009, Howard provided Thompson with a letter which purported to confirm the reason for his absence on August 24, 2009. The letter included contact information for Howard's probation officer, Gil Esparza. Thompson called Esparza to confirm Howard's explanation. As a result his conversation with Esparza, Thompson determined that Howard was dishonest regarding the reason for his absence on August 24, 2009.

{¶ 8} On September 25, 2009, Thompson called Howard in order to inform him that his employment had been terminated. Howard testified that Thompson demanded that he sign a statement acknowledging insubordination ostensibly for lying about his August 24, 2009, absence from work. Howard stated that he refused to sign the statement, and Thompson immediately fired him. Thompson stated that during their conversation on September 25, 2009, Howard did not inform him that he had filed for unemployment compensation a day earlier on September 24, 2009. Rather, Thompson stated that he only became aware of Howard's filing for unemployment benefits three days after the termination on September 28, 2009. It is undisputed that Howard did not file a claim for workers' compensation at any time between April 22, 2009, and September 25, 2009, when his employment was terminated.

{¶ 9} On January 28, 2010, Howard filed a complaint against BDT, Thompson, and

Rumpke in which he advanced the three following claims for relief: 1) violation of Howard's right to leave time under the FMLA and retaliation for exercising those rights; 2) violation of R.C. 4123.90; 3) wrongful discharge in violation of public policy as expressed in R.C. 4123; and 4) wrongful discharge in violation of public policy as expressed in R.C. 4141. On September 24, 2010, BDT and Thompson filed a motion for summary judgment with Thompson's affidavit attached. Howard filed a memorandum in opposition with his attached affidavit on October 12, 2010. BDT and Thompson subsequently filed a reply memorandum on October 19, 2010. On October 27, 2010, the trial court granted BDT and Thompson's motion for summary judgment in its entirety.[1]

{¶ 10} It is from this judgment that Howard now appeals.

II

{¶ 11} Howard's first assignment of error is as follows:

{¶ 12} "THE TRIAL COURT ERRED BY MISAPPLYING THE INTEGRATED ENTERPRISE DOCTRINE OF THE FMLA."

{¶ 13} In his first assignment, Howard contends that the trial court erred when it held that BDT and Rumpke are not an integrated employer for the purposes of the FMLA. 29 C.F.R. § 825.104(c)(2).

**Standard of Review**

{¶ 14} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial

---

[1]We note that on October 28, 2010, Howard dismissed its claims against Rumpke without prejudice pursuant to Civ. R. 41(A)(1)(a). Thus, Rumpke is not involved in the instant appeal.

court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 12.

{¶ 15} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶ 16} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. *Id*.

{¶ 17} The FMLA provides eligible employees of covered employers up to twelve workweeks of unpaid leave in any twelve-month period in order to tend to certain familial obligations, such as caring for a loved one who has a serious health condition. *Engelhardt v. S.P. Richards Company, Inc.* (C.A.1, 2006), 472 F.3d 1. Pursuant to its authority under the FMLA, the Department of Labor has promulgated regulations which set forth the eligibility requirements for both employers and employees. Id. 29 C.F.R. § 825.110(a) defines "eligible employees" and requires that the employee:

{¶ 18} "(3) [be] employed at a worksite where 50 or more employees are employed

by the employer within 75 miles of that worksite."

{¶ 19} 29 C.F.R. § 825.104(a) defines "covered employers" as follows:

{¶ 20} "any person engaged in commerce or in any industry or activity affecting commerce, who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."

{¶ 21} Neither party disputes that BDT employs fewer than 50 employees and is not a "covered employer" under the FMLA. It is also undisputed that Rumpke employs well over 50 employees and is considered a "covered employer." Thus, the sole issue before the trial court with respect to the FMLA was whether BDT and Rumpke were an integrated employer pursuant to 29 C.F.R § 825.104(c)(2). The "integrated employer" test is used to impose liability on the legal employer by establishing that the separate entity is sufficiently related such that its actions, or in the instant case, size, can be attributable to the legal employer. *Engelhardt*, 472 F.3d 1. 29 C.F.R § 825.104(c)(2) provides as follows:

{¶ 22} "Separate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the 'integrated employer' test. Where this test is met, the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility. A determination of whether or not separate entities are an integrated employer is not determined by the application of any single criterion, but rather the entire relationship is to be reviewed in its totality. Factors considered in determining whether two or more entities are an integrated employer include:

{¶ 23} "(i) Common management;

{¶ 24} "(ii) Interrelation between operations;

{¶ 25} "(iii) Centralized control of labor relations; and

{¶ 26} "(iv) Degree of common ownership/financial control."

**A. Common Management**

{¶ 27} Factors which support a finding of common management include shared management and shared corporate officers between the two companies. *McConnell v. Swifty Transportation, Inc.* (S.D.Ohio 2005), No. 2:04-CV-0153. In *McConnell*, the court held that two companies had a common management scheme which supported a finding that they were an integrated employer when the two companies shared identical boards and virtually identical corporate officers. The court also noted that both companies had their principal place of business at the same location. Common management and common office space are both factors which support a finding that two companies constitute a single employer. *Mastell Trailer Corporation v. NLRB* (C.A.8, 1982), 682 F.2d 753. Conversely, a court found no indication of common management where there was no shared manager between two companies, SPR and GPC. *Engelhardt*, 472 F.3d 1. Moreover, the court found that no employee from SPR managers answered to any GPC employees. Id. In fact, all facets of SPR's operations were controlled and dictated by SPR's own employees. In his affidavit attached to his memorandum in opposition to summary judgment, Howard stated that Thompson identified himself as a manager for Rumpke of Dayton. Howard also stated that Thompson signed forms bearing the Rumpke logo in his capacity as "President" and "Manager." Additionally, Howard stated that Ron Head signed Rupmke forms with the title "Supervisor." Howard points out that Thompson has a Rumpke e-mail address. Another BDT employee, Richard Ebright, stated in his affidavit that upon becoming employed by

BDT, he received a Rumpke business card which identified Thompson as the Residential Manager for Rumpke of Dayton, Ohio.

{¶ 28} Regarding whether BDT and Rumpke satisfied the requirement for common management, the trial court held that this factor did not weigh in favor of a finding that BDT and Rumpke were an integrated employer. Specifically, the trial court concluded that BDT's "use and signing of forms with Rumpke logos solely indicates that BDT chose to be economically efficient." We disagree. Viewed in a light most favorable to Howard, the evidence indicates that Thompson held himself out to be a manager for Rumpke as well as the president of BDT. Thus, the evidence submitted by Howard weighs in favor of a finding that BDT and Rumpke shared common management.

### B. Interrelation Between Operations

{¶ 29} In determining the level of interrelation between the operational aspects of two companies, factors to be taken into account include common offices, record keeping, bank accounts, and common equipment. Upon review of the evidence submitted by Howard, the trial court found that this factor weighed "slightly" in favor of a finding that BDT and Rumpke were an integrated employer.

{¶ 30} In *McConnell*, the court found evidence of interrelation of operations between SPR and GPC where the two companies shared a work force, one company administered and provided all payroll and benefits functions for the other company for a fee, and the two companies shared corporate headquarters, a telephone number, and a fax number. Alternatively, the court in *Grace v. USCAR* (C.A.6, 2008), 521 F.3d 655, found little evidence of interrelation when the two companies in question maintained separate offices.

Moreover, the court found that the nature of the companies' work was completely different; one company performed research and design for the car industry, while the other company was a staffing agency. Id.

{¶ 31} The trial court relied on the following evidence in making the determination that BDT and Rumpke were interrelated: 1) BDT and Rumpke share common office space, although not the corporate headquarters of Rumpke; 2) BDT and Rumpke share telephone and fax numbers; 3) both companies engage in the business of the solid waste collection and disposal; 4) BDT uses Rumpke equipment, such as Rumpke garbage trucks; 5) Howard stated that employees of BDT wore uniforms emblazoned with the Rumpke logo; and 6) Howard stated that he periodically received paychecks from Rumpke. The trial court did note that Howard presented no evidence that BDT and Rumpke share record keeping or bank accounts.

{¶ 32} After reviewing the evidence submitted by Howard, we agree with the trial court and conclude that the level of interrelation between the operations of BDT and Rumpke weigh in favor of finding that the businesses are an integrated employer. Just as the court found in *McConnell*, BDT and Rumpke share common office space, a telephone number, and a fax number. Both companies engage in the same line of work. BDT employees wear uniforms with the Rumpke logo and drive Rumpke trucks. Lastly, the evidence establishes that Howard routinely received paychecks from Rumpke. All of these factors clearly support a finding that BDT and Rumpke are interrelated business operations.

**C. Centralized Control of Labor Relations**

{¶ 33} Centralized control of labor relations is often considered of primary

importance in an integrated employer analysis since it tends to overlap the other factors. *Braden v. Cty. of Washington* (W.D. Pennsylvania 2010), 749 F.Supp.2d 299; see *Schweitzer v. Advanced Telemarketing Corp.* (C.A.5, 1997), 104 F.3d 761, 764, (recognizing that the control of labor relations prong has traditionally been the most important). This factor may take into account elements such as the ability to hire, fire, and supervise employees, as well as control over employees' work schedules. *Braden*, 749 F.Supp.2d 299. Additionally, who controls day-to-day employment decisions also factors into the analysis, as are tasks such as "handling job applications, approving personnel status reports, and exercising veto power over major employment decisions." Id.

{¶ 34} Initially, we note that Howard does not argue that Rumpke had the power to hire or fire BDT employees. Additionally, Thompson submitted Howard's W-2 form which lists BDT as Howard's employer. At first blush, these factors seem to mitigate in favor of a finding that there was no centralized control of labor relations.

{¶ 35} However, Howard points out that BDT adopted and used Rumpke's employment application to hire potential employees. BDT also distributed other Rumpke forms and policies, *including Rumpke's FMLA policy*, to its employees. The trial court concluded that BDT's decision to use Rumpke's employment forms and personnel policies was done merely "to capitalize on economies of scale," because it was cheaper than creating its own forms and policies. *Engelhardt*, 472 F.3d 1, 7-8. In *Engelhardt*, the court found that SPR merely used GPC's employment forms and policies in order to save money, and the plaintiff's evidence of SPR's adoption of the forms and policies, standing alone, was insufficient to satisfy the centralized control of labor relations factor.

{¶ 36} Howard argues that the trial court's decision in this regard is not supported by the record. Howard notes that there is no evidence in the record which suggests that BDT uses Rumpke forms simply because it's cheaper or to capitalize on economies of scale. Rather, Howard argues that BDT's use and distribution of Rumpke's forms, especially Rumpke's FMLA policy, created a genuine issue regarding whether BDT intended to be bound by Rumpke's employment policies.

{¶ 37} Howard also points out that BDT employees were subject to Rumpke's employment policies directly related to job performance on a day-to-day basis. For example, BDT used and implemented Rumpke's attendance policy, its return-to-work policy, and its vacation policy. BDT employees drove Rumpke trucks, attended safety meetings held by Rumpke employees, and followed the directions of Rumpke safety inspectors. Ebright stated that BDT employees were required to carry a Rumpke Medical Examiner's Certification. Moreover, Howard asserts that BDT hired employees through Rumpke job advertisements. All of these factors, when taken together, establish that Rumpke had some control over BDT's labor relations. Accordingly, these factors clearly support a finding of centralized control of labor relations between BDT and Rumpke.

### D. Degree of Common Ownership/Financial Control

{¶ 38} Howard does not dispute that there is no common ownership between BDT and Rumpke and that this fact weighs against a finding that the companies are an integrated employer. However, the absence of one factor is not conclusive in an integrated employer analysis. *Armbruster v. Quinn* (C.A.6, 1983), 711 F.2d 1332 (reversed on other grounds).

{¶ 39} In light of the foregoing analysis, we conclude that a genuine issue of material

fact exists regarding whether BDT and Rumpke constitute an integrated employer for the purposes of the FMLA. Howard has provided sufficient evidence of three of the four necessary factors in the instant analysis. Therefore, the trial court erred when it granted BDT's motion for summary judgment on Howard's FMLA claim.

{¶ 40} Howard's first assignment of error is sustained.

III

{¶ 41} Howard's second assignment of error is as follows:

{¶ 42} "THE TRIAL COURT IMPROPERLY DISMISSED THE CLAIM FOR WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY BASED ON THE PUBLIC POLICY SET FORTH IN R.C. 4123.90, IGNORING THE IMMEDIATE RETALIATION UPON MR. HOWARD'S REPORT OF THE INJURY TO MR. THOMPSON AND STATING HIS INTENTION TO FILE A WORKER'S COMPENSATION CLAIM."

{¶ 43} In his second assignment, Howard argues that the trial court erred when it dismissed his claim for wrongful termination in violation of the public policy set forth in R.C. 4123.90. Specifically, Howard asserts that Thompson terminated his employment on September 25, 2009, in retaliation because he informed Thompson on September 9, 2009, that he intended to file a worker's compensation claim for the injury that occurred on April 22, 2009. The record indicates that Howard did not file a claim for workers' compensation until nearly three months after his termination on December 10, 2009.

{¶ 44} In support of his argument, Howard cites our recent decision in *Sutton v. Tomco Machining, Inc.*, 186 Ohio App.3d 757, 2010-Ohio-830. In *Sutton*, the plaintiff

injured his back at work and immediately informed the president. Id. Within an hour of talking to the president, the plaintiff was discharged from his employment as an at-will employee. Id. We subsequently held that when an employee suffers a work related injury, he may bring a claim for wrongful discharge if his employer discharges him so quickly that he has no reasonable opportunity to file a claim or institute proceedings under the Workers' Compensation Act when the employer lacks an overriding business justification for the discharge. Id.

{¶ 45} The Ohio Supreme Court recently affirmed in part and reversed in part our decision in *Sutton*, recognizing a common law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after an injury but before the individual files a claim for workers' compensation. *Sutton v. Tomco Machining, Inc.*, Slip Opinion No. 2011-Ohio-2723, ¶ 37. The Supreme Court further held that "to establish causation, a plaintiff who alleges wrongful discharge in violation of public policy as expressed in R.C. 4123.90 must prove that the adverse employment action was retaliatory, which requires proof of a nexus between the adverse employment action and the potential workers' compensation claim." Id.

{¶ 46} In the instant case, Howard argues that he was terminated on September 25, 2009, in retaliation for informing Thompson on September 9, 2009, that he intended to file a workers' compensation claim. According to Howard, Thompson affirmatively stated during the September 9, 2009, conversation that he would deny Howard's workers' compensation claim were he to file one. Thompson denies that the conversation ever took place. However, viewed in a light most favorable to Howard, the non-moving party, a genuine

issue exists regarding whether he was discharged for stating his intention to file a workers' compensation claim. Thus, the trial court erred when it dismissed Howard's claim for wrongful discharge in violation of the public policy underlying R.C. 4123.90.

{¶ 47} Howard's second assignment of error is sustained.

IV

{¶ 48} Howard's third and final assignment of error is as follows:

{¶ 49} "THE TRIAL COURT ERRED BY DISREGARDING MR. HOWARD'S TESTIMONY RELATING TO THE UNEMPLOYMENT COMPENSATION PUBLIC POLICY CLAIM."

{¶ 50} In his final assignment, Howard contends that the trial court erred when it dismissed his claim for wrongful discharge in retaliation for applying for unemployment compensation benefits and granted BDT summary judgment regarding that issue. Specifically, Howard argues that a genuine issue of material fact exists as to whether Thompson was aware that Howard intended to file for unemployment benefits before his employment was terminated. In his affidavit attached to his memorandum in opposition, Howard stated that during a telephone conversation on September 11, 2009, he informed Thompson directly that he intended to apply for unemployment benefits while he was suspended from work. Thus, Howard asserts that his termination was executed in retaliation for revealing his intent to apply for unemployment benefits. Howard stated in his affidavit that he promptly applied for unemployment after his conversation with Thompson and began receiving his benefits on September 20, 2009.

{¶ 51} Conversely, Thompson asserts that Howard never discussed his intent to seek

unemployment benefits during the meeting on September 11, 2009. Thompson further asserts that he was unaware that Howard filed for unemployment benefits when he decided to terminate Howard. Thompson also attached a form from the Ohio Department of Job and Family Services Office of Unemployment Compensation which states that Howard applied for unemployment benefits on September 24, 2009, and that the benefit year beginning date was September 20, 2009. Howard argues that the dates on the form from ODJFS are incorrect and that he applied for benefits shortly after September 11, 2009, and began receiving said benefits on September 20, 2009. Thompson argues that the record establishes that neither he nor BDT had any knowledge of Howard's application prior to its decision to terminate his employment.

{¶ 52} Regardless of the alleged discrepancy in the application dates on the ODJFS form, Howard stated in his affidavit that he informed Thompson during their conversation on September 11, 2009, that he intended to apply for unemployment benefits. Thompson denied that the issue of unemployment benefits was ever discussed at the September 11, 2009, meeting. The trial court held that Howard could not "avoid summary judgment by solely relying on an unsupported affidavit contradicting the facts stated" in Thompson's motion for summary judgment. In this instance, the trial court misapplied the evidentiary requirements of Civ. R. 56(C). This is not a situation where Howard submitted an affidavit which contradicted his own prior testimony. BDT did not request to depose Howard in this case. BDT merely relied on the affidavit of Thompson in support of its motion for summary judgment. In order to refute the arguments advanced by BDT, Howard attached his own affidavit since there was no deposition from which to cite.

{¶ 53} However, the statement in Howard's affidavit failed to create a genuine issue of material fact regarding whether Thompson's decision to terminate Howard's employment was in retaliation for his decision to apply for unemployment benefits.   Simply put, Howard failed to establish, even minimally, that his notification to Thompson of his intent to file for unemployment benefits on September 11, 2009 was the proximate cause of BDT's decision to terminate his employment approximately fourteen days later on September 25, 2009. There is nothing in the record, other than a relatively strained temporal nexus, which links Howard's termination to his stated intention to file for unemployment benefits.   Thus, the trial court did not err when it granted BDT's motion for summary judgment and dismissed Howard's claim for wrongful discharge.

{¶ 54} Howard's third assignment of error is overruled.

V

{¶ 55} Howard's first and second assignments of error having been sustained, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for proceedings consistent with this opinion.

. . . . . . . . . .

FAIN, J. concurs.

HALL, J., concurring:

{¶ 56} I concur with the resolution of the assignments of error stated in the majority opinion. I write separately to explain what otherwise might appear to be an internal inconsistency.

{¶ 57} The appellant's third claim, and related third assignment of error, deals with

the allegation that he was terminated from employment in retaliation for pursuing a claim for unemployment compensation. In its Motion for Summary Judgment on that claim, the employer denied that appellant was fired for applying for unemployment compensation because the employer didn't even know of the unemployment filing and the employer further stated other reasons why appellant was fired. Our decision holds that the appellant failed in his reciprocal duty to demonstrate a genuine issue of material fact that expressing his intent to apply for unemployment was the proximate cause of his firing.

{¶ 58} The appellant's second claim, and related second assignment of error, deals with the allegation that he was terminated from employment in retaliation for informing his boss that he would file a workers' compensation claim. The trial court granted Summary Judgment for the defendant on that cause of action because the facts reveal he was injured April 22, 2009 and he had not filed his workers' compensation claim as of his termination from employment on September 25, 2009. The trial court had granted Summary Judgment for the defendants on this cause of action on the basis that appellant had an extended period of time to pursue a workers' compensation claim before he was fired. Therefore, following the then-applicable decision of this court in *Sutton v. Tomco Machining, Inc.*, 186 Ohio App.3d 757, 2010-Ohio-830, the appellant had a sufficient window of opportunity to file his workers' compensation claim before his firing so he could not pursue a common law retaliation claim.

{¶ 59} On June 9, 2011, the Ohio Supreme Court released *Sutton v. Tomco Machining, Inc.*, Slip Opinion No. 2011-Ohio-2723, which expanded on this court's previous decision in the case. It recognized a common law claim for a retaliatory firing in a

workers' compensation setting unrestricted to those who were fired with only a brief window of opportunity to file their claim. Consequently, the trial court's grant of summary judgment must be reversed on the basis of the recent Supreme Court decision. Unlike the appellant's unemployment compensation retaliation claim, where proximate cause of the firing had been presented as a factual issue, the issue of whether the appellant's firing was proximately caused by the announcement that he would pursue a   workers' compensation claim was not argued or addressed below. If it had been, one might conclude that the temporal relationship between the firing coupled with the alleged statement by the employer to the effect that the employer would fight such a claim, are insufficient to lead to a logical and reasonable inference of a cause and effect relationship. But because this specific issue was not fully addressed or argued, it would be inappropriate for this court to resolve the second assignment of error on that issue. Therefore, even if the appellant has failed to demonstrate the causal relationship between his announced intention to file a workers' compensation claim and his firing, the matter should be remanded for further proceedings on that assignment of error and that cause of action.

. . . . . . . . . .

Copies mailed to:

Kenneth J. Heisele
John R. Folkerth, Jr.
Thomas A. Dierling
Hon. Connie S. Price